764 P.2d 1118

**LASMA CORPORATION, an Arizona corporation, and Lasma Arabians, Ltd., a limited partnership; William C. Zekan and Betty Zekan, husband and wife, Plaintiffs–Appellees Cross–Appellants,**

v.

**MONARCH INSURANCE COMPANY OF OHIO, an Ohio corporation; and Frelinghuysen Livestock Managers, Inc., Defendants–Appellants Cross–Appellees.**

**No. CV 87–0315–PR.**

Supreme Court of Arizona,
En Banc.

Aug. 30, 1988.

Reconsideration Denied Dec. 1, 1988.

Lewis and Roca by Susan M. Freeman, Randolph J. Haines, and Foster Robberson, Phoenix, for plaintiffs-appellees cross-appellants Lasma.

Rawlings, Burrus, Lewkowitz & Feinstein, P.C. by R. Stewart Halstead, and Jeffrey S. Leonard, Phoenix, for plaintiffs-appellees cross-appellants Zekan.

Fisher and Smith by H. Richmond Fisher, and Francis P. Smith, Phoenix, for defendants-appellants cross-appellees.

JACOBSON, Court of Appeals Judge.

The issue raised by this review of a decision of the Court of Appeals, Division 2, 159 Ariz. 55, 764 P.2d 1114 (App.1987) is whether the term "sound health" of an animal in a mortality insurance policy refers to the actual health of the animal, the policyholder's belief in the sound health of the animal, or something in between.

This matter was presented to a jury based upon the reasonable belief of the policyholder. The jury returned a verdict in favor of the policyholders, William C. Zekan and Betty Zekan (Zekans) in the sum of $116,000 as compensatory damages and the sum of $750,000 punitive damages, arising from a bad faith claim, together with $103,855 as attorney fees and $6,548 as costs. The jury also awarded the loss payee, Lasma Corporation (Lasma) the sum of $464,000 as compensatory damages, $500,000 as punitive damages, $142,863.27 in attorney fees and $11,653 costs. The Court of Appeals reversed on the basis that the jury was improperly instructed, holding that the "sound health" of the animal referred to actual health and that the subjective belief of the policy holder concerning health of the animal was immaterial. This court granted review to determine the propriety of the Court of Appeals' resolution of this issue and also whether punitive damages, in any event, were proper.[1]

The case arises out of a claim on a liability policy insuring the life of an Arabian mare, *Eroica. The policy was issued by

---

1. The insurance company does not question the award of attorney fees or costs in this matter if the plaintiffs prevail upon their breach of contract claim.

Monarch Insurance Company of Ohio (Monarch), by its managing general agent, Frelinghuysen Livestock Managers, Inc. (FLM). The trial court correctly concluded that Monarch and FLM were to be considered as one for purposes of assessing liability and will hereinafter, unless the context otherwise requires, be referred to collectively as Monarch.

On February 6, 1983 *Eroica was sold at auction in Scottsdale, Arizona by Lasma at auction to the Zekans for the sum of $580,-000, of which the Zekans paid $116,000 at time of purchase, the balance of $464,000 being evidenced by a promissory note payable over five years.

Monarch provided "fall of the hammer" binder insurance for livestock mortality on *Eroica. This binder was issued without a prior physical examination of the horse because the Lasma auction was an "authorized public sale." An "authorized public sale" is one where, because of the seller's reputation for honesty and selling healthy horses, "fall of the hammer" insurance coverage is afforded. At the time of the auction, a health record prepared by Dr. Patrick J. Moloney, a veterinarian employed by Lasma, was available to prospective purchasers. This report showed *Eroica had no significant health problems. Dr. Anthony Stachowski, a veterinarian employed by the Zekans also examined *Eroica prior to sale and concluded the mare to be in sound health. The policy issued by Monarch contained a specific condition:

At the commencement of this insurance, each animal hereby insured must be in sound health and free from any illness, disease, lameness, injury or physical disability whatsoever.

There is no dispute that at the time of the sale, *Eroica appeared healthy, "looked fantastic," "was vibrant with health," "made an outstanding impression by her exciting performance" and was "absolutely gorgeous." A videotape of her appearance at the time of the auction was shown to the jury.

Following the sale, *Eroica was shipped to Lasma's farm in Kentucky, for breeding. Upon her arrival in Kentucky on February 17, 1983, the mare was diagnosed as having "shipping fever," a mild upper respiratory infection which results in an elevated fever and a "snotty nose." *Eroica recovered from the shipping fever within four days. Also, Dr. Brendemüehl, a veterinarian employed by Lasma, found a small amount of material in one gutteral pouch, which Dr. Brendemuehl did not consider significant. Later examination on February 22 found both gutteral pouches clear. Following this examination, the Zekans were notified of the shipping fever symptoms.

In February, the Zekans, in order to continue the insurance coverage afforded by the binder issued at time of sale, made a formal application for insurance. This application form contained detailed questions regarding the health of the animal. However, since the mare was sold at an authorized auction, FLM did not require this form to be completed.

On March 18, *Eroica developed respiratory symptoms, a dorsally displaced palate, marked inflammation and gutteral pouch opening obstruction. Surgery to correct the obstruction was unsuccessful and the mare began starving to death. She was euthanized in April. Subsequent investigation into the health history of *Eroica revealed that in 1982 she had contracted a contagious condition known as "strangles," which is a bacterial infection of the respiratory system. The mare had recovered from this condition prior to sale. The Zekans were informed of the condition and recovery prior to purchase. *Eroica also suffered from an anatomical abnormality known as a dorsally displaced soft palate. This condition refers to the positioning of the soft palate in relation to the epiglottis in the throat area. A horse normally displaces the soft palate when swallowing. In *Eroica, this displacement would occur intermittently, usually after exercise. What part this abnormality played in *Eroica's ultimate death was hotly contested. Monarch's veterinarian expert testified this condition directly resulted in the gutteral infection which led to the mare's death. Experts called by Lasma and the Zekans opined that the condition was of no func-

tional significance and was completely unrelated to *Eroica's death. There is no evidence that the Zekans were aware of this condition at the time of purchase. There is evidence that Lasma was aware of the abnormality.

This litigation consisted of claims by the Zekans and Lasma for breach of contract, tort of bad faith and punitive damages. Monarch counterclaimed against the Zekans and Lasma for negligent misrepresentation, and Lasma for fraudulent concealment. All of these claims were submitted to the jury which returned verdicts in favor of the Zekans and Lasma. In addition the jury found in favor of Zekans and Lasma on Monarch's counterclaims. No appeal was taken by Monarch as to the counterclaim determination.

## BREACH OF CONTRACT

Monarch's defense to the contract claims is that *Eroica did not meet the specific condition of the policy which provided:

> At the commencement of this insurance, each animal hereby insured must be in sound health and free from any illness, disease, lameness or physical disability whatsoever.

The trial court submitted this issue to the jury under the following instruction:

> Under Arizona law, the policy condition was satisfied if, as of February ·6, 1983, the Zekans reasonably believed that *Eroica was in sound health. 'Sound health' means having no grave, important or serious disease and being free from any ailment that seriously affects the general soundness and healthfulness of the system. (emphasis added).

Monarch contends this instruction is improper in two respects: (1) the reasonable belief of the insured is immaterial as it is the actual health of the animal that is material and (2) if reasonable belief is material, it is Lasma's belief as a loss payee under the policy as well as Zekans' belief which must be considered by the jury.

The Court of Appeals correctly points out that the instruction erroneously placed the entire decision relating to the existence of a contract on Zekans' reasonable belief, ignoring the contract claim of Lasma as loss payee. However, since the Court of Appeals concluded that the state of *Eroica's actual health was what should have been submitted to the jury, it did not consider whether this error was fatal.

We turn first then to a determination of whether the special condition on sound health refers to the actual health of the animal or the reasonable belief of the insureds as to sound health. Insofar as human life insurance is concerned, there appears to be an equal split of authority as to whether the apparent health of the insured or the knowledge of the insured is material in applying a "good health" clause. As the annotator in Insurance—Good Health Clause, 30 A.L.R.3d 389, 394 noted:

> [W]here the good health required is not expressly qualified by the insured's possession of knowledge or information about his health, the authorities are apparently to some extent divided as to the effect of the insured's lack of knowledge of his unhealthliness upon the applicability of the good health clause.

The Court of Appeals' analysis (that sound health refers to actual health) has some merit when applied to the type of "fall of the hammer" coverage afforded here; no medical examinations are required; the buyer at auction is not intimately knowledgeable of the medical condition of the horse; and the insurance covers not a human life but the life of an animal, personal property. Under such conditions, policy considerations might favor construing a "sound health" clause as requiring the actual sound health of the animal as a condition precedent to coverage. However, equally pressing policy considerations might require knowledge of the insured and the insured's agent to be material. See *Metropolitan Life Insurance Co. v. Devore*, 66 Cal.2d 129, 424 P.2d 321, 56 Cal.Rptr. 881 (1967).

We need not linger long on which of these competing policies we should adopt as the insurer here has itself construed the clause to be based upon the knowledge of

the various insureds. Adolph Vita, President of FLM testified:

Q: Okay, now, with Specific Condition 1 in this Monarch Insurance Policy, can't an insured feel secure that he or she has insurance on the animal that she's bought?

A: If the insured is being perfectly candid with us in their application and information that is submitted for underwriting, they have absolutely nothing to be concerned about.

Q: So when does FLM apply specific condition number 1?

A: When the insured gives us the improper information on the application or when their veterinary (sic) gives us improper information on the veterinarian certificate.

\* \* \* \* \* \*

A: If the insured has no knowledge, and if the agents of the insured have no knowledge and we cannot establish that there was any knowledge, we cannot apply [specific condition number 1].

The insurer having adopted this construction and the authorities being somewhat split, we see no reason to construe it differently.

■ We therefore address the effect of the instruction which limited the scope of the insured's knowledge to that of the Zekans' and ignored the knowledge of Lasma, the seller and loss payee. There is no question that Lasma knew *Eroica's prior health history. The issue in controversy was whether this knowledge would reasonably lead one to suspect that *Eroica was not in sound health. Lasma tacitly agrees that the jury was not asked to resolve this issue under the court's instruction on sound health, but argues that the exact same issue was presented by Monarch's counterclaim and was resolved against Monarch. We agree.

Under the instructions given to the jury on Monarch's counterclaim for negligently supplied false information, the jury was asked to determine whether Lasma either supplied false information or failed to exercise reasonable care in disclosing important

facts to Monarch; that Monarch relied upon the information actually supplied; and whether Monarch suffered a monetary loss as a result of Lasma's supplying false information or Lasma's failure to give correct information.

Under this instruction, the jury could have found that Lasma negligently represented that *Eroica was in sound health, or that it failed to supply information directly related to the state of that health, that is, that *Eroica suffered from a displaced soft palate, or had respiratory problems, and that Eroica died as a result of any of these conditions, which resulted in a monetary loss to Monarch. In fact, this is exactly what was argued to the jury by Monarch's counsel. Because it was undisputed that *Eroica had the physical ailments mentioned, the jury must have concluded that their existence resulted in no loss to Monarch. Monarch would not have been entitled to any further jury determinations had the trial court properly instructed them under the contract claim.

We therefore conclude that the failure of the trial court to include Lasma in its instruction defining the sound health clause was harmless error under the circumstances.

### BAD FAITH CLAIM

■ Monarch next contends that the trial court erred in allowing the tort of bad faith to go to the jury. We agree. The tort of bad faith only arises when an insurance company intentionally denies or fails to process or pay a claim without a reasonable basis for such action. *Rawlings v. Apodaca*, 151 Ariz. 149, 156, 726 P.2d 565, 572 (1986). Thus, the tort will not lie for claims which are "fairly debatable." *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981).

Here, Monarch had information following the death of *Eroica that the mare had a history of respiratory ailments and suffered from an abnormality known as a dorsally displaced soft palate. Its investigation revealed that Lasma was aware of these conditions prior to sale and had failed to reveal their existence. Moreover, Mon-

arch had expert opinions that these conditions were causally related to *Eroica's death. Aside from the legitimate legal issue as to the proper interpretation of the term "sound health", the validity of Lasma's claim from a "knowledge standpoint" was fairly debatable. Thus, as to Lasma, the issue of bad faith was improperly submitted to the jury.

■ As to the Zekans, early in the investigation of this claim, Monarch determined that the existence of the dorsally displaced soft palate, which it contended resulted in *Eroica's death, was apparently unknown to the Zekans. Based upon this determination, Monarch offered to pay the Zekans their entire loss, $116,000.00; take a subrogation position as to the Zekans; and seek reimbursement from Lasma, who Monarch perceived as the true villain. In addition, in the event Lasma sought collection of the balance due from the Zekans, Monarch offered to defend the Zekans in that action. Of course if Lasma was successful, Monarch's policy would cover the Zekans' obligation under the loss payee provision.

The Zekans refused that offer and insisted that Monarch pay the entire loss, $580,-000.00. This litigation ensued. Under the circumstances where Zekans' entire loss was to be paid and Monarch was to provide a defense to any action against them, we conclude that likewise the issue of bad faith as to the Zekans was improperly submitted to the jury.

■ Finally we come to the cross appeal of Lasma and Zekans. Lasma sought damages from Monarch for disruption of business and for an alleged statutory discrimination violation under A.R.S. § 20–448(C). The trial court granted Monarch's motion for directed verdict on both claims. The disruption of business claim was based upon the time and effort of Lasma employees to collect on the insurance claim and to prepare for trial. Lasma concedes that a plaintiff in a contract action is limited to the economic damages which were in the contemplation of the parties at the time the contract was made, but argues this rule is inapplicable for tort damages when bad faith is involved. Since we conclude that

Monarch was not guilty of bad faith and that claim preparation costs are not reasonably within the contemplation of the parties, especially when Lasma has recovered all of its litigation costs plus attorney fees, we find that the trial court properly withheld this claim from the jury.

■ Next, Lasma argues that it was discriminated against within the meaning of A.R.S. § 20–448(C). This statute generally prohibits discrimination between insureds having substantially like insuring, risk and exposure factors. Lasma's claim of discrimination is that Monarch offered to pay Zekans for their loss, but refused to offer to pay its loss. It then concludes, without analysis, that since there was "one horse, one insurance policy and one claim ... if one claim was payable, both were." As previously pointed out, the defenses available under the policy were different for the Zekans and Lasma based upon their different prior knowledge of the condition of the mare. Without deciding what discrimination is prohibited under A.R.S. § 20–448(C), it is clear that the exercise of policy defenses against different insureds does not fall within its prohibition. This claim is without merit and was properly denied.

Zekans' cross appeal deals with the trial court's granting directed verdicts against them on their claim for damages for business interference and for emotional distress. Zekans concede that both claims arise out of their tort claim against Monarch. As we have concluded that this tort action was not sustainable, the claims based thereon were of necessity also properly denied.

In summary, the judgments in favor of Zekans and Lasma for breach of contract, together with the judgment for attorneys fees, interest and costs are affirmed. The judgments based upon the tort of bad faith and for punitive damages are reversed. The orders of the trial court giving rise to the cross appeals are affirmed. Lasma's and Zekans' requests for attorneys fees based upon the contract claims are granted and these parties are requested to comply with Rule 21, Rules of Civil Appellate Procedure, for assessment of such fees. Mon-

arch, as the successful party on appeal, is granted its costs.

FELDMAN, V.C.J., and HOLOHAN, CAMERON and MOELLER, JJ., concur.

GORDON, C.J., did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, JACOBSON, Judge, Court of Appeals, Division One, was designated to sit in his stead.