977 P.2d 134

**Kimberly K. ZILISCH, a single person, Plaintiff–Appellant, Cross Appellee,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Arizona corporation, Defendant–Appellee, Cross Appellant.**

**No. 1 CA–CV 96–0610.**

Court of Appeals of Arizona, Division 1, Department D.

Sept. 8, 1998.

Review Granted May 25, 1999.

Thur & O'Sullivan, P.C. by Calvin C. Thur Scottsdale and Dawson & Rosenthal by Steven C. Dawson Phoenix, for Plaintiff–Appellant, Cross Appellee.

O'Connor, Cavanagh, Anderson, Killingsworth & Beshears, P.A. by Ralph E. Hunsaker and Christopher Robbins, Phoenix, for Defendant–Appellee, Cross Appellant.

KLEINSCHMIDT, Judge.

¶ 1 The plaintiff, Kimberly Zilisch, sued her insurance company for an alleged bad faith refusal to pay its policy limits under Zilisch's underinsured motorist coverage. The jury awarded her compensatory damages of $460,000 and punitive damages of $540,000. The trial court granted the insurance company's judgment NOV as to punitive damages, but denied the insurance company's motion for new trial as to bad faith. Zilisch filed a motion for new trial as to punitive damages only, premised on her claim that the trial court had erroneously excluded evidence which bore on that issue. This motion was denied and Zilisch appealed. State Farm cross-appealed, claiming that it was entitled to judgment on the bad faith claim as a matter of law, that the trial court had erred in admitting certain evidence, and that the trial court had erred in awarding Zilisch her attorneys' fees. We conclude that State Farm was entitled to judgment in its favor on the bad faith claim because the value of Zilisch's claim was fairly debatable. It follows that Zilisch was not entitled to an award of attorneys' fees. Our conclusion moots all of the other issues raised by the parties.

## SUMMARY OF FACTS AND PROCEDURE

¶ 2 The case arose out of an automobile accident. In November 1990, Zilisch was riding in a car driven by her boyfriend when they were struck by a car driven by a teenager named Jason Fornoff. Fornoff was drag-racing with other teenagers, and Zilisch's boyfriend bore no fault for the accident.

¶ 3 Zilisch's boyfriend was killed, and Zilisch received a head injury which resulted in third nerve palsy, causing double vision and a drooping eyelid. She also suffered a permanent abduction and malrotation of her right little finger. In addition, she suffered from post-traumatic stress disorder stemming from the death of her boyfriend.

¶ 4 Zilisch demanded the policy limits from all of the at-fault drivers. Fornoff had automobile liability insurance with State Farm Insurance Company with coverage limits of $100,000/$300,000. Zilisch ultimately received $146,500 in liability insurance proceeds, of which State Farm paid $95,000, the amount of coverage left on the Fornoff policy after part of it was paid to settle with another claimant.

¶ 5 Zilisch was also insured with State Farm, and she had uninsured/underinsured motorists coverage (UM/UIM) of up to $100,000. In December 1991, after exhausting the liability policies, Zilisch, through her attorney, Gene Gulinson, demanded the policy limits under her UIM coverage. In his demand letter, Gulinson described Zilisch's injuries in detail and enclosed the hospital records and the records of the Phoenix doctors who had treated Zilisch. He also included information from Zilisch's employer, Motorola, which showed that her work had suffered as a result of the accident. He noted that she had developed double vision. In the letter, Gulinson told the insurance company that Zilisch had consulted William Hoyt, M.D., a leading neuro-ophthalmologic surgeon from San Francisco. Gulinson said that Hoyt had advised Zilisch that no surgery currently available could fix her left eye or restore further function to it.

¶ 6 In his demand letter, Gulinson valued Zilisch's claim "conservatively" at $1.25 million and went on to say that potential damage to Zilisch's career and possible lost wages might amount to $5.1 million. He closed by demanding the policy limits of $100,000.

¶ 7 When State Farm received the demand, it assigned the case to one of its claims representatives, Scott Chan. Chan met with Zilisch and her attorney in January 1992, and prepared a report in which he confirmed that Zilisch appeared to have the problems she related to him. He noted that if the doctor's reports were correct, her condition was permanent. He also noted that Gulinson was to provide Dr. Hoyt's report and Zilisch's pre-accident performance reports from Motorola.

¶ 8 Shortly thereafter, Chan contacted a Phoenix physician, who is referred to in the record simply as Dr. Yudell. Dr. Yudell told Chan that Dr. Hoyt was the leading world expert in neuro-ophthalmology and that if

Dr. Hoyt believed the injuries were permanent, then most likely they were.

¶ 9 With Gulinson's permission, Chan called Dr. Hoyt on January 20, 1992. Dr. Hoyt told Chan that he could not find his chart on Zilisch, but he related that it was his opinion that she seemed to be doing well. Very shortly thereafter, Gulinson told Chan that he would procure and forward a report from Dr. Hoyt. When State Farm had still not received the report by June, Chan's supervisor told him to request a release so that State Farm could get the report directly from the doctor.

¶ 10 On June 30, 1992, Gulinson wrote to State Farm demanding settlement and enclosing a current report from Dr. Michael Balis, a neuro-ophthalmologist, and Dr. Hoyt's report as well. Dr. Hoyt's report described Zilisch's condition:

> My examination showed that she had normal visual function in each eye. She had near normal appearance of her eyes in the mid position of gaze. The left lid showed only minimal ptosis. The range of movement of the left eye was restricted. She had about 10% of normal adduction, 5% of normal elevation, 60% of normal depression. When she looked downward, her left upper lid stayed elevated. Her left pupil was slightly dilated and fixed to direct light stimulation. [U]nder the magnification of a slitlamp it showed minor movements indicating pupillary misdirection of nerve fibers. She had variable double vision in all fields of gaze *except* straight ahead, left gaze and left downward gaze. Her corneal tear film was normal in both eyes. There was no hint of corneal surface erosion on the left eye.
>
> Conclusion: Kimberly has permanent signs of third nerve misdirection in regeneration on the left side. She is very fortunate that her appearance is good and that she has a very useful central range of binocular single vision that she can use for driving and reading. The area of single vision is restricted, but it is better than a majority of patients have after third nerve palsy, and it is better than any eye surgeon could hope to attain by operation on her eye muscles.
>
> Her pupillary paralysis in the left eye is not a significant disability, but it might cause some symptoms of glare in bright light. [H]er ability to focus the left eye for near vision is also deficient. This problem can be compensated, if needed with reading glasses.
>
> In June 1991, Dr. Balis noted that Kimberly had symptoms and signs of slight dryness of the tear film on the right eye. She did not report these symptoms to me and I saw no hint of tear film deficiency or corneal change in my examination. Apparently this problem has cleared up.

¶ 11 Gulinson told State Farm that he was not looking for a counteroffer and that if State Farm would not pay the policy limits, he, Gulinson, would request that the matter be submitted to arbitration.

¶ 12 Upon receipt of this letter, State Farm reassigned the file to another claims representative, Donald Neu. It also noticed Zilisch's examination under oath for September 2, 1992. That examination was postponed until the end of the month to accommodate Gulinson. A State Farm claims supervisor, Lance Lane, attended that examination and concluded that Zilisch's injury was more significant than originally thought.

¶ 13 Neu undertook a formal evaluation report in late October 1992. He concluded that Zilisch's total claim was worth between $200,000 and $225,000. Because Zilisch had already been paid $145,000 by the liability carriers, Neu requested and received settlement authority in the range of $55,000 to $75,000. Before making his evaluation, Neu had prepared a compendium of the value of eye injury cases. He did not consider the compendium particularly helpful because he could find no cases involving third nerve palsy and because, depending on the type and severity of eye injuries, the damage awards varied widely. As a result of this compilation and the reevaluation, Neu wrote Gulinson offering to settle for $55,000. Gulinson rejected the offer and advised Neu that he would not respond to any offer of less than the policy limits. The matter proceeded to arbitration.

¶ 14 The arbitration hearing was held on February 24, 1993, resulting in an award of $387,500 to Zilisch. State Farm immediately paid the policy limits of $100,000. Zilisch then filed her bad faith action from which this appeal and cross-appeal arise.

## THE "FAIRLY DEBATABLE" DEFENSE

¶ 15 The thrust of Zilisch's claim at trial was that State Farm had deliberately refused to pay the policy limits even though it knew her claim exceeded that amount. She sought to prove, through former State Farm employees, an expert witness, and by informing the jury of other acts of bad faith on the part of State Farm as reflected in other cases that had been tried and appealed, that State Farm had engaged in a deliberate scheme of underpaying claims. Her major specific evidence related to State Farm's compilation of a monthly report of how much money each of its claims representatives paid out in settlements. There was evidence that State Farm has engaged in improper claims practices by setting arbitrary goals for the reduction of claims paid and that the salaries and bonuses paid to claims representatives were influenced by how much the representatives paid out on claims.

¶ 16 State Farm's defense was that the value of Zilisch's claim was fairly debatable. If that was the case, State Farm argues that it was justified in refusing to pay the policy limits until the claim had been arbitrated.

■ ¶ 17 In *Noble v. National American Life Insurance Co.*, 128 Ariz. 188, 624 P.2d 866 (1981), our supreme court first recognized the tort of bad faith for an insurer's refusal to pay a claim. In defining the tort, it followed the lead of the Wisconsin Supreme Court in *Anderson v. Continental Insurance Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978), which said:

The tort of bad faith can be alleged only if the facts pleaded would, on the basis of an objective standard, show the absence of a reasonable basis for denying a claim, i.e., would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances.

271 N.W.2d at 376–77.

¶ 18 More recently, in *Lasma Corp. v. Monarch Insurance Co.*, 159 Ariz. 59, 63, 764 P.2d 1118, 1122 (1988), in holding that certain facts would not support a claim of bad faith, the supreme court said:

The tort of bad faith only arises when an insurance company intentionally denies or fails to process or pay a claim without a reasonable basis for such action. *Rawlings v. Apodaca*, 151 Ariz. 149, 156, 726 P.2d 565, 572 (1986). Thus, the tort will not lie for claims which are "fairly debatable." *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981).

## WHETHER THE CLAIM WAS FAIRLY DEBATABLE IS A QUESTION FOR THE COURT IN THIS CASE

■ ¶ 19 In *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982), the court said that the question whether a claim is fairly debatable is for the jury to decide. *See also Gurule v. Illinois Mut. Life and Cas. Co.*, 152 Ariz. 600, 734 P.2d 85 (1987); *Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175 (9th Cir.1988). In a number of cases, however, the question has been decided by the court as a matter of law. *See Lasma Corp.*, 159 Ariz. at 64, 764 P.2d at 1123; *Aetna Cas. and Sur. Co. v. Superior Court*, 161 Ariz. 437, 440, 778 P.2d 1333, 1336 (App.1989); *Lake Havasu Community Hosp. v. Arizona Title Ins. Co.*, 141 Ariz. 363, 687 P.2d 371 (App.1984). No Arizona case offers clear guidance as to when it is proper to submit such a case to the jury.[1] In the case before us there are no disputed facts which bear on the question whether the

---

1. Some jurisdictions follow the "directed verdict rule" which in practical effect makes every question of fair debatability one for the court. Under that rule, if the court cannot grant a directed verdict for the insured, the claim is fairly debatable as a matter of law, and the insurer is entitled to a directed verdict in its favor. *See* Stephen S. Ashley, Bad Faith Actions, Liability and Damages, § 5:04, at 5–17 to 5–18 (2d ed.1997). This is clearly not the approach the Supreme Court of Arizona has taken.

claim was fairly debatable. The only dispute is what conclusion should be drawn from the undisputed facts. That is the kind of dispute which is appropriate for a court to decide. *Robarge v. Bechtel Power Corp.,* 131 Ariz. 280, 282, 640 P.2d 211, 213 (App.1982).

## THE VALUE OF THE CLAIM WAS FAIRLY DEBATABLE

■ ¶ 20 A party is entitled to judgment as a matter of law "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). A scintilla of evidence will not forestall judgment. *Id.* In ruling on a motion for summary judgment the evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in that party's favor. *Id.* at 309–10, 802 P.2d at 1008–09. It is, however, appropriate for a court to "evaluate the evidence to some extent." *Id.* at 309, 802 P.2d at 1008. In *Orme School,* the court pointed out, for example, that evidence offered by the non-moving party that is inadmissible may be ignored.[2] *Id.*

■ ¶ 21 Based on the *Orme School* standard, we conclude that reasonable minds could only conclude that the value of the Zilisch claim was fairly debatable. Zilisch's injuries were serious, but not catastrophic. She had double vision except when she looked straight ahead and to the left, her pupils were asymmetric, and she had some problem with hand/eye coordination. The droop in her eyelid had, however, improved to the point where it was hardly noticeable. She conceded that the problem with her finger was minimal. While her emotional upset was genuine and serious, there was nothing exaggerated or abnormal about her reaction to her misfortune. Nor was there any evidence that the accident would have a long-term negative effect on her livelihood.

¶ 22 State Farm conducted an adequate investigation. Indeed, Zilisch does not suggest what more it could have done to evaluate an injury that appears to have been almost unique.

¶ 23 In deciding whether this claim was fairly debatable, we give careful consideration to the testimony of Zilisch's expert witness. The testimony establishes the credentials of the plaintiff's witness as an expert in the field of insurance and shows that he conducted an adequate review of the factual record in this case. The expert acknowledged in a general way that the evaluation of a personal injury claim is subjective, and he said that the insurer is supposed to weigh and balance a number of factors to try and predict what a jury will do. Based on his experience and his reading of a compendium of jury verdicts, primarily from California, it was his opinion that Zilisch's claim was worth far more than the policy limits. He never testified that the claim was not fairly debatable, although it can be inferred from what he said that he did not believe it was.

¶ 24 The expert was critical of the way State Farm conducted its investigation, saying that it was outrageously unreasonable for the insurer to wait for Dr. Hoyt's report because it already had information from other doctors about the extent of her injury. He also believed that State Farm should have at least offered the $75,000 that it had authorized its claims representative to pay.

¶ 25 There are a number of reasons why we do not believe the expert's testimony was sufficient to create a question for the trier of fact on the issue of fair debatability. While he did say that this claim was worth more than the policy limits, his opinion was highly conclusory. It was based on his experience and nothing more than a general review of jury verdicts. He offered nothing specific

---

**2.** Other courts have recognized that under a standard like the one applied in *Orme School* an expert opinion can simply be too weak to save a party from a directed verdict. *See, e.g., Plutshack v. Univ. of Minn. Hosps.,* 316 N.W.2d 1 (Minn.1982) (court undertakes an extensive evaluation of medical expert's testimony and explains why it should be discounted); *Phillips v. District of Columbia,* 714 A.2d 768 (D.C.App.1998) (court undertakes analysis of expert testimony and concludes it was inadequate to establish a standard of care).

with respect to the range of values for losses similar to Zilisch's.

**¶ 26** It was also clear that the expert's opinion was influenced by some irrelevant factors. The first was his reliance on the fact that this was a case of clear liability, and that Zilisch was not at fault. Liability was not an issue in the case at all, and it would have no bearing on a trial in which the only issue was damages. The second of these irrelevant factors the expert considered was the size of the arbitrator's award. The fact that an insurance company's valuation may ultimately prove to be wrong is not relevant to the resolution of a bad faith issue. *See Aetna Cas. and Sur.*, 161 Ariz. at 440, 778 P.2d at 1336.

**¶ 27** There is another lesser problem with the expert's opinion. His inference that the value of the claim was not fairly debatable is interwoven with, and may well have been influenced by, his opinions about how State Farm handled this claim in particular and State Farm's claim practices in general. In some respects those opinions are insupportable and in others they are irrelevant. For example, the expert thought it was "outrageous" for State Farm to wait for the report from Dr. Hoyt. We think this opinion is insupportable. When one views the overall situation, the Hoyt report was important. A reasonable trier of fact simply could not find otherwise. So, too, the expert's opinion that the claims representative should have offered the maximum amount he was authorized to pay is also insupportable in view of the fact that Zilisch's attorney advised State Farm not to bother with such offers because Zilisch would accept nothing less than the policy limits. *See Rhiel v. Wisconsin County Mut. Ins. Corp.*, 212 Wis.2d 46, 568 N.W.2d 4 (Wis.App.1997) (where claim was fairly debatable, demand for nothing less than policy limits excused insurers failure to negotiate); *see also Bucholtz v. Safeco Ins. Co. of Am.*, 773 P.2d 590 (Colo.App.1988) (not bad faith

to stop negotiating after insured demanded arbitration).

**¶ 28** The reason we say that some of the expert's testimony about claims practices was irrelevant is because, as we discuss in detail below, the issue of fair debatability is a threshold question. If the claim was fairly debatable, poor practice and bad motives do not enter into the inquiry. So, too, the expert's opinions, express and inferred, about State Farm's motivations were of "dubious" admissibility. *See Gurule v. Illinois Mut. Life and Cas. Co.*, 152 Ariz. 600, 604 n. 4, 734 P.2d 85, 89 n. 4 (1987).

## IF A CLAIM IS FAIRLY DEBATABLE, THE INSURER IS ENTITLED TO JUDGMENT IN ITS FAVOR EVEN IF THERE IS EVIDENCE THAT IT ENGAGES IN QUESTIONABLE CLAIMS PRACTICES

**¶ 29** We are fully aware of the fact that in this case the plaintiff produced evidence of a dubious claims practice—the attempt to arbitrarily reduce claim payouts and the use of each claims representative's payout record to reward or penalize the representative. Although there can be legitimate reasons for State Farm to compile such information, we will, for the sake of argument, assume that State Farm has engaged in improper claims practices and that it might be inferred that such practices had an impact on its conduct in this case.[3]

**¶ 30** The question is whether an insurer who employs any improper claims practices which may have influenced its negotiations is nonetheless entitled to a judgment in its favor when, as a matter of law, the claim was fairly debatable. In other words, is "fair debatability" truly a threshold question? For several reasons, we believe that it is.

**¶ 31** First, the Arizona cases which discuss "fair debatability" say that it is a de-

---

**3.** A number of State Farm employees conceded that it would be improper to let the pressure generated by a system of rewards and penalties operate against the interests of an insured. See also *Hawkins v. Allstate Insurance Co.*, 152 Ariz. 490, 495–96, 733 P.2d 1073, 1078–79 (1987), in

which our supreme court noted, without expressing approval or disapproval, that the court of appeals in a memo decision had held that an apparently similar practice was admissible on the issue of punitive damages.

**40**

fense to a bad faith action. They appear to assume that if the claim is fairly debatable, all inquiry ends. At the very least, no case holds to the contrary.

¶ 32 Second, if fair debatability were not a threshold question, every claim, no matter how ill-founded, against any insurance company that might have engaged in generalized improper claims practices would become a bad faith claim. We do not believe that would be good policy.

¶ 33 Third, in the context of fair debatability, *Anderson,* the seminal case from Wisconsin, refers to judging the insurance company's conduct by an objective standard. *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978). If we were to find that an action in bad faith can proceed on a claim that is fairly debatable as a matter of law, we would be doing so based on the insurer's subjective motive.

¶ 34 Finally, those jurisdictions which follow the directed verdict rule referred to in footnote 1, *supra,* appear to employ an objective standard in weighing the insurer's conduct. Subjective motive is only important if the insurer fabricates evidence to create fair debatability or relies solely on contradicted facts which it alone generates. *See* ASHLEY, *supra,* § 5:04, at 5–18 to 5–20. Neither of these exceptions fits the case before us.

### CONCLUSION

¶ 35 The claim was fairly debatable. State Farm was entitled to a directed verdict in its favor on the bad faith claim, even in the face of evidence that it may have engaged in generalized improper claims practices. This case is remanded to the trial court with orders to vacate the judgment and award of attorneys' fees and enter judgment for State Farm. In our discretion, we deny State Farm's request for attorneys' fees on appeal.

MICHAEL D. RYAN, Presiding Judge, and SHELDON H. WEISBERG, Judge, concur.