995 P.2d 276

**Kimberly K. ZILISCH, a single person, Plaintiff–Appellant, Cross Appellee.**

**v.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Arizona corporation, Defendant-Appellee, Cross Appellant.**

No. CV–98–0535–PR.

Supreme Court of Arizona, En Banc.

March 3, 2000.

Thur & O'Sullivan By Calvin C. Thur, Scottsdale, and Dawson & Rosenthal By Steven C. Dawson, Phoenix, Attorneys for Kimberly K. Zilisch.

The Cavanagh Law Firm By Ralph E. Hunsaker, Christopher Robbins, Phoenix, Attorneys for State Farm Mutual Automobile Insurance Company.

Anderson Kill & Olick, New York, By David A. Paige (formerly with Anderson Kill & Olick now with Quarles & Brady), Phoenix, and Eugene R. Anderson, New York, Attorneys for Amicus Curiae Consumer Federation of America.

Treon, Strick, Lucia & Aguirre By Arthur G. Newman, Jr., Phoenix, Attorneys for Amicus Curiae United Policyholders.

The Langerman Law Offices By Amy G. Langerman, Richard W. Langerman, Phoenix, Attorneys for Amicus Curiae Arizona Trial Lawyers Association.

Law Offices of John L. Tully By John L. Tully, Barbara S. Burstein, Tucson, Attorneys for Amicus Curiae Foundation for Taxpayer and Consumer Rights.

Broening, Oberg, Woods, Wilson & Cass By James R. Broening, David S. Shughart, III, Phoenix, Attorneys for Amicus Curiae Farmers Insurance of Arizona.

## OPINION

MARTONE, Justice.

¶ 1 We granted review in this first-party bad faith case to sort out the relationships among (1) the absence of a reasonable basis for denying a claim, (2) fair debatability, (3) who gets to decide (judge or jury), and (4) evidence of improper claims practices.

### I.

¶ 2 Zilisch, a passenger in a car driven by her fiancé, was struck by a teenage drag-

racer. The fiancé died. Zilisch was permanently injured.

¶ 3 Zilisch recovered $146,500 in liability insurance proceeds from the at-fault drivers. She had underinsured motorist coverage with a $100,000 policy limit. Because $146,500 was insufficient to cover her injuries, Zilisch, through her lawyer, Gene Gulinson, demanded the $100,000 policy limits from State Farm on December 18, 1991.

¶ 4 In the settlement demand package, Gulinson provided State Farm with all available medical and employment records. One of the physicians who examined Zilisch, Dr. William Hoyt, a leading neuro-ophthalmologic surgeon, did not provide a written report to Gulinson in time to be sent with the package. In the demand letter, Gulinson did, however, explain that Dr. Hoyt had advised Zilisch that no surgery currently available could fix her left eye. State Farm assigned the case to claims representative Scott Chan. On January 9, 1992, Chan interviewed Zilisch, observed her injuries, and asked Gulinson to provide State Farm with Dr. Hoyt's medical records. The next day, Chan prepared a report in which he stated Zilisch appeared to have the problems she described to him, and acknowledged that if the physicians' reports were correct, her condition was permanent.

¶ 5 On January 14, 1992, Gulinson wrote Chan a letter in response to Chan's request for Dr. Hoyt's records. Gulinson explained that Dr. Hoyt's secretary told Gulinson no record or report existed because Zilisch simply saw Dr. Hoyt for informational purposes to learn more about her eye condition. Gulinson gave Chan Dr. Hoyt's phone number and permission to call if State Farm wanted to confirm that no records existed.

¶ 6 Chan telephoned Dr. Hoyt's office on January 20, 1992, and spoke with Dr. Hoyt. Although Dr. Hoyt could not immediately find Zilisch's chart, he stated that her injuries were permanent. In order to get a second opinion, Chan contacted another neurologist, Dr. Alan Yudell, on the same day he talked to Dr. Hoyt. Dr. Yudell agreed with Dr. Hoyt that the third nerve palsy was permanent because the symptoms had persisted in excess of one year.

¶ 7 After an exchange of communication, and some delay, on June 30, 1992, Gulinson submitted Dr. Hoyt's report to State Farm. The report reaffirmed that Zilisch's third nerve palsy was permanent. Along with the report, Gulinson enclosed a letter that repeated Zilisch's demand for the policy limits, reiterated that Zilisch was not looking for a counteroffer, and provided the name and address of Zilisch's arbitrator in the event State Farm rejected the demand.

¶ 8 On July 2, 1992, Chan prepared a report to claim superintendent, Lance Lane, suggesting Zilisch's claim was worth nothing because the amount she received from the liability carriers fully compensated her. Less than one week later, Lane reassigned the file to another claim representative, Donald Neu, and on September 1, 1992, Neu estimated Zilisch's injuries to be worth $15,-000 to $20,000 in addition to her liability insurance recovery.

¶ 9 On September 29, 1992, Lane attended an examination of Zilisch under oath. After hearing Zilisch's testimony and personally observing her injuries, Lane concluded "the value of the claim was more significant than [State Farm] had originally evaluated it." Tr. Feb. 7, 1996 at 149.

¶ 10 Based on Lane's face-to-face encounter with Zilisch and a compendium of the value of prior eye injury cases, Neu formally evaluated Zilisch's claim on October 27, 1992. Neu concluded Zilisch's total claim was worth between $200,000 and $225,000. Because Zilisch had already received $146,500 from liability carriers, Neu requested and was granted authority to settle the claim in the range of $55,000 to $75,000.

¶ 11 State Farm ultimately offered Zilisch $55,000 to settle her UIM claim. Zilisch rejected this offer. State Farm then ordered an independent medical examination by Dr. John Aiello on November 9, 1992, in preparation for arbitration. After examining Zilisch, Dr. Aiello confirmed the third nerve palsy was permanent.

¶ 12 On December 12, 1992, Lane wrote a letter to James Decker, State Farm's divisional claims superintendent. Lane stated

that because Gulinson was unwilling to entertain any offers less than the policy limits, State Farm would re-offer $55,000 before arbitration rather than extend full file authority of $75,000 as recommended by State Farm's claims litigation counsel. When no settlement could be reached, the matter proceeded to arbitration on February 24, 1993. The arbitrators awarded Zilisch $387,500. State Farm then paid Zilisch the policy limits of $100,000.

¶ 13 Zilisch brought this bad faith tort action against State Farm alleging it breached its duty of good faith and fair dealing by deliberately refusing to pay the policy limits of her UIM claim when it knew the claim exceeded that amount. At trial, Zilisch produced evidence that State Farm engaged in a deliberate practice of underpaying claims nationwide. The evidence suggested State Farm set arbitrary claim payment goals for its claims personnel in order to reach the company goal of having the most profitable claims service in the industry. Promotions and salary increases for State Farm claims personnel were based on reaching these goals. Zilisch's expert testified that State Farm's delay in evaluating her claim was unreasonable, its ultimate settlement offer of $55,000 was "outrageous," and the way it handled Zilisch's claim was consistent with the way it did business across the country.

¶ 14 State Farm argued it was justified in refusing to pay the policy limits until the claim had been arbitrated because the value of Zilisch's claim was fairly debatable.

¶ 15 The jury returned a verdict in favor of Zilisch in the amount of $460,000 in compensatory damages and $540,000 in punitive damages. The trial court set aside the award of punitive damages.

¶ 16 Zilisch appealed and State Farm cross-appealed. The court of appeals held that even if State Farm engaged in improper claims practices that influenced its conduct, it nevertheless was entitled to judgment in its favor if the claim was fairly debatable as a matter of law. *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 194 Ariz. 34, 39, 977 P.2d 134, 139 (App.1998). Believing that this raised a serious question under our opinion in *Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz.

504, 838 P.2d 1265 (1992), we granted review. Rule 23(c)(3), Ariz. R. Civ.App. P.

## II.

¶ 17 The court of appeals held that as long as the amount the insurer ultimately offers to its insured is fairly debatable, nothing else it does in investigating the claim, evaluating the claim, and paying the claim really matters.

¶ 18 The court said, "[i]f the claim was fairly debatable, poor practice and bad motives do not enter into the inquiry." *Zilisch*, 194 Ariz. at 39, 977 P.2d at 139. The court acknowledged that Zilisch "produced evidence of a dubious claims practice—the attempt to arbitrarily reduce claim payouts and the use of each claims representative's payout record to reward or penalize the representative." *Id.* But it characterized "fair debatability" as a "threshold question" which is outcome determinative. *Id.*

¶ 19 While it is clear that an insurer may defend a fairly debatable claim, all that means is that it may not defend one that is not fairly debatable. But in defending a fairly debatable claim, an insurer must exercise reasonable care and good faith. Here are the basic rules.

¶ 20 The tort of bad faith arises when the insurer "intentionally denies, fails to process or pay a claim without a reasonable basis." *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981). While an insurer may challenge claims which are fairly debatable, *id.*, its belief in fair debatability "is a question of fact to be determined by the jury." *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982). An insurance contract is not an ordinary commercial bargain; "implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986). The insurer has "some duties of a fiduciary nature," including "[e]qual consideration, fairness and honesty." *Id.* at 155, 726 P.2d at 571. Thus, "an insurer may be held liable in a first-party case when it seeks to

gain unfair financial advantage of its insured through conduct that invades the insured's right to honest and fair treatment," and because of that, "the insurer's eventual performance of the express covenant—by paying the claim—does not release it from liability for 'bad faith.' " *Id.* at 156, 726 P.2d at 572. And in *Deese,* 172 Ariz. at 508, 838 P.2d at 1269, we noted that an insurance contract provides more than just security from financial loss to the insured. We said, "the insured also is entitled to receive the additional security of knowing that she will be dealt with fairly and in good faith." *Id.* Thus, if an insurer acts unreasonably in the manner in which it processes a claim, it will be held liable for bad faith "without regard to its ultimate merits." *Id.* at 509, 838 P.2d at 1270.

¶ 21 The court of appeals focused exclusively on the amount ultimately offered by the carrier and said that everything else was irrelevant. But coming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case. The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy. It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy. It cannot lowball claims or delay claims hoping that the insured will settle for less. Equal consideration of the insured requires more than that. The court of appeals therefore erred in concluding that fair debatability is both the beginning and the end of the analysis.

### III.

¶ 22 Applying *Orme School v. Reeves,* 166 Ariz. 301, 802 P.2d 1000 (1990), the court of appeals held that State Farm was entitled to directed verdict because "reasonable minds could only conclude that the value of the Zilisch claim was fairly debatable." *Zilisch,* 194 Ariz. at 38, 977 P.2d at 138. But, as we have held, while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient

condition. The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable. *Noble,* 128 Ariz. at 190, 624 P.2d at 868; *see also Deese,* 172 Ariz. at 507, 838 P.2d at 1268.

¶ 23 There was sufficient evidence in this case from which a jury could find that State Farm acted unreasonably and knew it. There was evidence that State Farm set arbitrary goals for the reduction of claims paid. The salaries and bonuses paid to claims representatives were influenced by how much the representatives paid out on claims. *See Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 499, 733 P.2d 1073, 1082 (1987) (past practices relevant and admissible). Reasonable jurors could also find that State Farm took an unreasonable length of time to evaluate Zilisch's claim. Reasonable jurors could have concluded that the question of permanency was undisputed and that State Farm's insistence on seeing a non-existent report was a pretext to drag out the claims process. Zilisch demanded the policy limits on December 18, 1991. Despite having all available medical and employment records at that time, State Farm did not evaluate and offer to settle the claim until October 27, 1992, nearly ten months after receiving the demand. There was expert testimony that State Farm's claim that it was waiting for a report from Dr. Hoyt was unreasonable because (1) State Farm already had the reports from four other physicians describing the permanency of the injury, (2) On January 20, 1992, Chan telephoned Dr. Yudell who stated that Zilisch's injuries were permanent, and (3) on that same day Chan called Dr. Hoyt and confirmed the permanency of the injury. If, after all of this, State Farm still had doubts about the permanency of the injury, it could have subjected Zilisch to an independent medical examination. But State Farm did not ask for such an examination until November 9, 1992, *after* it had already offered to settle the claim for $55,000.

¶ 24 Even if reasonable jurors could have concluded that it was prudent for State Farm

to wait for Dr. Hoyt's report, it took State Farm four more months after receiving the report to evaluate the claim and make an offer. During this four month period, State Farm's evaluation of the claim went from zero dollars on July 2, 1992 to between $15,000 and $20,000 on September 1, 1992, and then to $55,000 to $75,000 on October 27, 1992, despite not having received any new information. Even after State Farm's lawyer recommended that it offer $75,000, State Farm refused to offer more than $55,000. A jury could disbelieve State Farm's contention that it chose not to increase its offer because of the nature of Zilisch's demand.

¶ 25 In light of this evidence, it is not the case that reasonable people could only agree that State Farm's handling of this claim was neither unreasonable nor intentional. Thus, the trial court was correct in submitting this case to the jury. That State Farm ultimately came up with an offer that jurors could have found reasonable would be sufficient to deny directed verdict in favor of Zilisch, but is insufficient to grant directed verdict in favor of State Farm.

### IV.

¶ 26 We vacate the opinion of the court of appeals. This means that the other issues raised by State Farm and Zilisch on appeal are not moot. Accordingly, we remand the case to the court of appeals for consideration of the merits of those issues.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, STANLEY G. FELDMAN, Justice, and RUTH V. McGREGOR, Justice.