**Brian MILHONE, Plaintiff,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant.**

**No. CV 01–96–PHX–JAT.**

United States District Court,
D. Arizona.

Sept. 8, 2003.

Charles J. Surrano, III, Esq., John Neal Wilborn, Esq., Surrano Law Offices, Phoenix, AZ, for plaintiff.

Floyd P. Bienstock, Karl Michael Tilleman, Esq., David Otto Krier, Steptoe & Johnson LLP, Evan S. Goldstein, Esq., Herman Goldstein & Forsyth PC, Phoenix, AZ, for defendant.

## ORDER

TEILBORG, District Judge.

Pending before this Court is Defendant's Motion for Summary Judgment (Doc. # 77). In the Motion, Defendant moves for summary judgment on Plaintiff's bad faith claim (this Court has already granted Defendant's Motion for Judgment on the Pleadings on Plaintiff's Consumer Fraud Claim and Unfair Claims Practice Act Claim. *See* Doc. # 56). Defendant has not moved for summary judgment on Plaintiff's punitive damages request. However, if Defendant prevails on summary judgment on bad faith, no counts will be left and the motion for summary judgment will dispose of the entire case (as Defendant noted in footnote 4 of its motion). However, if Defendant's motion on bad faith is denied, because Defendant did not separately move on punitive damages, the Court will not consider Defendant's

separate punitive damages argument raised in its Reply.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, summary judgment is mandated, "... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are essentially undisputed. Plaintiff was in a car accident on February 21, 1999. Plaintiff did not go to the hospital immediately, but instead proceeded to his job as a Phoenix police officer. However, later that same night, Plaintiff did go to the emergency room. Plaintiff was treated for back pain and bruises and instructed to follow-up with his personal doctor. Plaintiff had an appointment with his personal doctor on February 23, 1999, who also treated Plaintiff for back pain and bruises. Plaintiff's doctor proscribed two sessions of physical therapy and limited Plaintiff to light duty work for three days. Plaintiff had his final appointment with his personal doctor on February 26, 1999, who released Plaintiff from care with no recommendations for further treatment.

Plaintiff then began treatment with a chiropractor on March 5, 1999. Over the next fifteen weeks, Plaintiff had 27 treatments. Plaintiff ended treatment with the chiropractor on June 23, 1999. The treatment was for neck, shoulder and groin pain.

During Plaintiff's period of treatment with the chiropractor, on April 9, 1999, Plaintiff was in an accident on the job. In this accident, Plaintiff was in a head to head collision with a suspect he was pursuing. Plaintiff went to the emergency room and was diagnosed with a "closed head injury." Defendant did not become aware of this additional injury to Plaintiff until between October 12, 1999 and October 27, 2000.

On April 2, 1999, Plaintiff made a "claim," through his counsel, to Defendant. However, Plaintiff did not make a "demand" until August 30, 1999. Plaintiff's initial demand was for $18,650.00. This demand included $3,166 in medical bills. Of

this $3,166 in medical bills, $2,120 were in bills from Plaintiff's chiropractor.

Following receiving the demand on August 30, 1999, Defendant began its investigation of Plaintiff's claim. As part of the investigation, Defendant requested information relating to Plaintiff's workers compensation claim, which was provided to Defendant on September 30, 1999. While Defendant waited for the workers compensation information, Plaintiff's counsel instructed Defendant not to make an offer until Defendant had all necessary information. After receiving the workers compensation information on September 30, 1999, Defendant made Plaintiff an offer on October 7, 1999. In determining the amount of this offer, Defendant used its computer program for evaluating claims, COLOSSUS. The offered made was based in part on the COLOSSUS recommendation and in part on the opinion of the adjustor.[1] The first offer made by Defendant was for $5,819 (an amount within the COLOSSUS range).

Plaintiff rejected the offer of $5,819 and demanded $10,000. The day after receiving Plaintiff's demand for $10,000, Defendant made an offer of $6,320 (an amount slightly above the COLOSSUS range). Plaintiff rejected the offer of $6,320, and demanded either $9,000 or $7,000.[2] Pursuant to the terms of the contract, Plaintiff advised Defendant that if it would not agree to $7,000, Plaintiff would exercise his right to arbitration. On October 12, 1999, in response to Plaintiff's $7,000 demand, Defendant requested additional information. Under the DOLF system for litigating claims, Defendant would not increase

its final offer without a change in circumstances justifying an increase in the amount. Plaintiff declined to provide the additional information Defendant requested, and Defendant refused to increase its offer to $7,000, so the parties proceeded to arbitration.

During the period between October 12, 1999, and October 27, 2000 (the date of the arbitration hearing), the parties engaged in some discovery to prepare for the arbitration. During this discovery, Defendant first learned about Plaintiff's injury on April 9, 1999 (the injury which occurred after the car accident giving rise to this case). Additionally, during discovery Defendant learned for the first time that Plaintiff was involved in another work related accident in December of 1998 (approximately two months before the car accident giving rise to this case).

As a result of this discovery, at the arbitration hearing, Defendant advocated that Plaintiff should not receive payment for any of his chiropractic bills because Defendant did not believe that the chiropractic treatment was the result of this car accident. Despite Defendant's arguments, the arbitrators awarded Plaintiff $9,000 on October 30, 2000. Defendant paid this amount on November 9, 2000. Plaintiff filed this action on December 18, 2000.

## III. DISCUSSION

### A. BAD FAITH UNDER ARIZONA LAW

■ Under Arizona law, a plaintiff establishes bad faith on the part of the insurance company by showing that the

---

1. The COLOSSUS assessment valued the settlement range at 5,800 to 6,300.

2. At paragraph 24 of its statement of facts, Defendant said Plaintiff demanded $7,000, which Plaintiff admitted in his responsive statement of facts. At Paragraph 48 of Plaintiff's statement of facts, Plaintiff claims he demanded $9,000, which Defendant then admitted in its rebuttal statement of facts. Hereinafter in this Order, the Court will construe the facts in the light most favorable to the Plaintiff and assume Plaintiff's final offer was $7,000.

company: 1) denied the claim without a reasonable basis for the denial, *and* 2) either knew or recklessly disregarded the fact that it did not have a reasonable basis for denying the claim. *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866, 868 (1981). The first prong of the test for bad faith is an objective test based on reasonableness. *Trus Joist Corp. v. Safeco Ins. Co.*, 153 Ariz. 95, 735 P.2d 125, 134 (1986). The second prong is a subjective test, requiring the plaintiff to show that the defendant insurance company committed consciously unreasonable conduct. *Id.*

In considering whether Defendant's conduct was reasonable, the Court considers whether the claim was "fairly debatable." *Deese v. State Farm Mutual Auto. Ins. Co.*, 172 Ariz. 504, 838 P.2d 1265, 1268 (1992). If a claim was *not* fairly debatable, and was denied by the insurance company, then the insurance company has, at a minimum, failed one prong of the *Noble* test. *See Zilisch v. State Farm Mutual Automobile Insurance Co.*, 196 Ariz. 234, 995 P.2d 276, 280 ¶ 22 (2000)("as we have held, while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient one"); *but see Lasma Corp. v. Monarch Ins. Co.*, 159 Ariz. 59, 764 P.2d 1118, 1122 (1988)("the tort [of bad faith] will not lie for claims which are 'fairly debatable' ").

■ However, even if as a result of a claim being fairly debatable Defendant is not liable for bad faith for failing to pay the claim immediately, Defendant might still be liable for bad faith if Defendant was unreasonable in processing the claim after the initial refusal to pay. *Zilisch,* 995 P.2d at 280, ¶ 22.

In *Zilisch . . . ,* the Supreme Court granted review of the court of appeals' decision and issued its opinion in part 'to sort out the relationships among (1) the absence of a reasonable basis for deny-

ing a claim, (2) fair debatability, (3) who gets to decide (judge or jury), and (4) evidence of improper claims practices.' *Zilisch,* 276, ¶ 1. In addition, the Supreme Court was troubled by the court of appeals' holding 'that as long as the amount the insurer ultimately offers to its [insured] is fairly debatable, nothing else it does in investigating the claim, evaluating the claim, and paying the claim really matters.' *Id.* 5, ¶ 17 (noting that such holding raised serious question under Supreme Court's opinion in *Deese,* 172 Ariz. 504, 838 P.2d 1265). The Supreme Court stated that '[w]hile it is clear that an insurer may defend a fairly debatable claim, all that means is that it may not defend one that is not fairly debatable.' *Id.* ¶ 19, 838 P.2d 1265. In vacating the court of appeals' decision, the Supreme Court clarified that '[in] defending a fairly debatable claim, an insurer must exercise reasonable care and good faith.' *Id.*

The Supreme Court set forth the 'basic rules' as follows: 'The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.' *Id.* 5, ¶ 20 (quoting *Noble,* 624 P.2d at 868). '[C]oming up with an amount that is within the range of possibility is not an absolute defense to a bad faith case.' *Id.* 5, ¶ 21. This is so because an insurer 'has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim. It should do nothing that jeopardizes the insured's security under the policy. It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy. It cannot lowball claims or delay claims hoping that the insured will settle for less. *Id.* . . . . 'The appropriate inquiry is whether there is sufficient evidence

from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable.' *Id.* 6–7, ¶ 22 (citing *Noble,* 624 P.2d at 868; *Deese,* 838 P.2d at 1268).

*Young v. Allstate Ins. Co.,* 2003 WL 21638281 at *3 (D.Ariz.2003).

With respect to the subjective prong of bad faith,

Generally, "[w]hile an insurer may challenge claims which are fairly debatable, . . . its belief in fair debatability 'is a question of fact to be determined by the jury.'" [*Zilisch,* 995 P.2d at] 279–80, ¶ 20 (quoting *Sparks v. Rep. Nat'l Life Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127, 1137 (1982)). If the plaintiff offers no significantly probative evidence that calls into question the defendant's belief in fair debatability, however, the court may rule on the issue as matter of law. *See Knoell v. Metro. Life Ins. Co.,* 163 F.Supp.2d 1072, 1077 (D.Ariz.2001) ('[B]ecause there are no questions of fact to present to a jury about whether the insurance company really believed it should investigate the claim verses just using the investigation as a pretext to avoid payment, this Court concludes that the Defendant did not act in bad faith by investigating the claim.').

*Young,* 2003 WL 21638281 at *4.

## B. BAD FAITH ALLEGATIONS IN THIS CASE

Here, Plaintiff alleges the following acts by the Defendant, which Plaintiff claims form the basis of his bad faith claim:

1) oppressive use of litigation to low-ball and consciously delaying the payment of admittedly legitimate claims (Response, pg 14);

2) the value of the claim was conclusively established at an amount "significantly" higher than Defendant's last offer (*id.,* pg. 15);

3) the severity of the accident required Defendant to admit injury (*id.*);

4) the fact of coverage was not in doubt and Plaintiff was entitled to some amount of money to compensate him (*id.*);

5) Plaintiff could not work without going to the doctor, who diagnosed objective symptoms (*id.*);

6) Defendant admitted that nearly all of the chiropractic care was reasonable (*id.*);

7) the lack of pre-existing injury (*id.*);

8) at arbitration, Defendant argued an amount of damages that was less than the COLOSSUS program arrived at and less than the arbitrators ultimately awarded (*id.,* pg. 16);

9) at arbitration, Defendant argued an amount less than one-third of its original offer without evidence conflicting Plaintiff's evidence (*id.*);

10) forcing the insured to arbitration is a needless hoop and causes unnecessary delay (*id.*);

11) unreasonable delay (*id*);

12) use of the DOLF program forces the insured to needless litigation because the insured hired an attorney (*id.*);

13) use of the COLOSSUS program produces arbitrary results and, coupled with DOLF, is unreasonable (*id.,* pg. 17);

14) low-ball offers not based on fair evaluation (*id.*);

15) no evidence to support Defendant's position (*id.*);

16) arbitrary goals to lower payments (*id.*);

17) lengthy delay (*id.*);

18) implementation of the Claims Core Process Redesign (CCPR) in 1995

after an internal audit by Defendant in which Defendant concluded that it was routinely overpaying claims by 15% (*id.* at 3);

19) use of COLOSSUS, a computer claim valuation system (to make the valuation of similar claims more uniform) (*id.*);

20) use of COLOSSUS as a mandatory valuation tool (rather than a suggestion to the adjustor) (*id.* at 5);

21) a) COLOSSUS's valuation methodology was not disclosed, b) Defendant admitted that COLOSSUS was not a viable indicator of the value of claims; c) Defendant discontinued the use of COLOSSUS in 1998 (*id.*) [3];

22) COLOSSUS did not take into account the affect of an injury to a particular insured's life, such as in this case where a physical injury has a high impact because Plaintiff has a job with strenuous physical requirements (*id.* at 6);

23) soliciting claims early to limit attorney involvement (*id.* at 3);

24) implementing the DOLF system, which requires an adjuster to make an offer and then not negotiate further unless there was a value changing event (*id.*);

25) adjusters were taught to keep payments under the amount suggested by COLOSSUS or the adjuster would have a negative performance review (*id.*);

26) the DOLF system targets insured that have counsel (*id.*);

The above list can be segregated into three categories: 1) conclusions; 2) facts that actually affected Plaintiff's claim; and 3) facts which may be true (though Defendant objects to the truth or admissibility of many of then), but which Plaintiff has not linked to his actual case.

### 1. CONCLUSIONS

First, beginning with conclusions, the following are listed above as alleged bad faith on the part of Defendant, but in reality are conclusions not supported by the evidence in this case. Specifically (using the numbers from above):

1) oppressive use of litigation to low-ball and consciously delay the payment of admittedly legitimate claims;

10) forcing the insured to arbitration is a needless hoop and causes unnecessary delay;

11) unreasonable delay;

13) use of the COLOSSUS program produces arbitrary results and, coupled with DOLF, is unreasonable;

14) low-ball offers not based on fair evaluation;

15) no evidence to support Defendant's position;

16) arbitrary goals to lower payments;

17) lengthy delay.

 All of the above "allegations" are merely conclusions and not evidence of bad faith. For example, number 10, 11, and 17 all focus on delay. However, the undisputed evidence in this case is that the time between when Plaintiff filed his claim and when Defendant made its first offer was

**3.** With respect to items b and c in this statement, Defendant objects to Plaintiff's use of this testimony in this case because it was elicited in other cases and is covered by protective orders in those cases; thereby, Defendant argues, making it inadmissable in this case. Regardless of Defendant's objection, the testimony is inconsistent with the facts of this case. The testimony indicated that Defendant discontinued the use of COLOSSUS in 1998. In this case the undisputed evidence is that Plaintiff submitted a claim in August of 1999 and that such claim was evaluated using the COLOSSUS system.

approximately 5 weeks. Next, the delay between when Plaintiff made his counter-demand, and Defendant made its counter-offer was 1 day. When Defendant would not accept Plaintiff's final demand, Plaintiff demanded that the parties proceed to arbitration. Thus, any delay while waiting to proceed to arbitration was the result of Plaintiff's request to exercise his rights under the contract and go to arbitration. Between when the arbitration award was issued and when Plaintiff was paid was 10 days. Thus, the total time from claim to payment attributable to Defendant in this case was approximately 7 weeks.[4] Therefore, Plaintiff's conclusions of lengthy delay and unreasonable delay are not supported by the record in this case.

The remaining allegations appear to be conclusions about Defendant's claims handling procedures as a whole. However, there is no evidence in this record to support that these are in fact the practices of Defendant. (For example, with respect to number 1, Plaintiff has not cited to a single case where Defendant engaged in "oppressive use of litigation." Moreover, "oppressive use of litigation" is itself a conclusion, not a fact.) Moreover, Plaintiff has failed to show that he was the victim of any of these conclusions or behaviors. In other words, Plaintiff has not shown that he suffered, "the oppressive use of litigation." Therefore, because none of these conclusions are supported by the evidence in this case (either with respect to Plaintiff of anyone else), these allegations cannot form the basis of Plaintiff's bad faith claim.

## 2. ALLEGED BAD FAITH TO PLAINTIFF

Second is the category of allegations of bad faith are items that affected Plaintiff in this case. Specifically:

2) the value of the claim was conclusively established at an amount "significantly" higher than Defendant's last offer;

3) the severity of the accident required Defendant to admit injury;

4) the fact of coverage was not in doubt and Plaintiff was entitled to some amount of money to compensate him;

5) Plaintiff could not work without going to the doctor, who diagnosed objective symptoms;

6) Defendant admitted that nearly all of the chiropractic care was reasonable;

7) the lack of pre-existing injury;

8) at arbitration, Defendant argued an amount of damages that was less than the COLOSSUS program arrived at and less than the arbitrators ultimately awarded;

9) at arbitration, Defendant argued an amount less than one-third of its original offer without evidence conflicting Plaintiff's evidence;

24) implementing the DOLF system, which requires an adjuster to make an offer and then not negotiate further unless there was a value changing event.

Taking each allegation in turn, number 2 claims that the ultimate value of the claim as determined by the arbitrators was "significantly" higher than offered by Defendant. Defendant's first offer was $5,819 ($3,181 less than the arbitrators awarded). Defendant's last offer was $6,320 ($2,680 less than the arbitrators awarded). Both of these amounts included the majority of Plaintiff's medical bills (total medical bills, including chiropractor, were $3,166) with the remaining amount being for general

---

4. Even some of this 7 weeks, however, passed while Defendant was waiting for documents from Plaintiff.

damages.[5] Plaintiff argues that such offers were so unreasonable that, coupled with the other facts of this case, there is a question of fact for the jury on bad faith (though the facts themselves are undisputed).

Allegations 3, 4, 5, and 6 are all undisputed. However, Defendant did everything Plaintiff claims Defendant was required to do in these allegations. With respect to number 3, Defendant never disputed that Plaintiff suffered some injury. With respect to number 4, Defendant admitted that Plaintiff was covered and entitled to some monetary compensation and in fact offered Plaintiff a settlement to compensate Plaintiff within 5 weeks of when the claim was filed. With respect to number 5, Defendant has never disputed that Plaintiff's doctor diagnosed him with injuries following his accident. Finally, with respect to number 6, Defendant, before discovery, admitted that it would pay for almost all of Plaintiff's medical bills, and offered a settlement amount consistent with that admission. Accordingly, the Court finds that no reasonable jury could find the Defendant liable for acting objectively unreasonably with respect to allegations 3, 4, 5, and 6, because Defendant behaved exactly consistent with how Plaintiff claims Defendant was required to behave.

■ Next, Plaintiff alleges the lack of a preexisting injury. While Defendant did not dispute this fact when it made all of its original offers, though discovery Defendant gained more information about Plaintiff's status. However, even after gaining this information, Defendant did not definitively determine that Plaintiff had a "preexisting injury." Instead, as indicated in Defendant's in-house counsel's testimony, Defendant determined that in Defendant's opinion, Plaintiff had misrepresented whether he had any other accidents in his initial report. Defendant also determined that, in Defendant's opinion, the areas of Plaintiff's body that were being treated by Plaintiff's chiropractor were areas that Plaintiff injured in his other accidents, and not the accident that is the basis for this suit. Therefore, while Defendant has not admitted lack of preexisting injury, Defendant is not offering evidence to dispute this allegation for purposes of summary judgment (or for purposes of the arbitration). Instead, Defendant argued both at the arbitration and for purposes of this motion that Plaintiff's own evidence (Plaintiff's doctor's reports) is inconsistent with Plaintiff's claim of no other accident or injury. Regardless, however, Plaintiff's lack of preexisting injury, assuming such fact is true, cannot form the basis of a bad faith claim, because when Defendant made its offers to Plaintiff, Defendant did not limit

---

5. Conversely, Plaintiff's first offer was for $18,650 ($9,650 more than the arbitrator's awarded). No Arizona court that this Court has located, unlike California, has specifically extended the duty of good faith of fair dealing, from which the tort of bad faith arises, to the Plaintiff under an insurance contract. *See e.g. Provident Accident and Life Ins. Co. v. Van Gemert*, 262 F.Supp.2d 1047, 1051 (C.D.Cal. 2003); *see also Young*, 2003 WL 21638281 at *3 (noting that "[i]n Arizona, insurance contracts include an implied covenant of good faith and fair dealing that requires *the parties* to refrain from any conduct that would im-

pair the benefits or rights expected from the contractual relationship. *See Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 570 (1986)."(emphasis added)). However, nothing inherent in the duty of good faith and fair dealing necessarily makes it only a duty on the part of the insurance company. Under the California approach, if Plaintiff is correct that offering $3,166 less than the arbitrators awarded was bad faith on Defendant's part, then Plaintiff demanding $9,650 more than the arbitrators awarded would be bad faith on Plaintiff's part.

the amount offered based on a preexisting injury theory.

Next, Plaintiff claims that the arguments Defendant made at arbitration were bad faith. Specifically, numbers 8 and 9 reflect that Defendant argued for an amount at arbitration that was less than Plaintiff ultimately received and less than Defendant initially offered. First, the Court questions whether it can ever be "unreasonable" or "bad faith" for a party to *advocate a position in an adversarial proceeding.* However, assuming *arguendo* that a party could be found liable in bad faith for a position taken in an adversarial proceeding, the facts of this case do not support such theory.

■ With respect to the fact that Defendant argued for an amount that was less that Defendant initially offered, as discussed above, Defendant had intervening discovery that caused Defendant to change its position. The fact that Defendant did not offer conflicting medical testimony does not cause Defendant's argument to have been in bad faith, because Defendant made its argument based solely on Plaintiff's own evidence. In other words, the basis for Defendant's argument was that Plaintiff's own evidence did not support Plaintiff's claim regarding the medical treatment Plaintiff required as a result of the accident that forms the basis for Defendant's duty to pay. The Court finds that no reasonable jury could find that making such an argument, based on the intervening discovery, was in bad faith.

With respect to the fact that Defendant argued for an amount less than the arbitrators awarded at the arbitration, the Court again finds that no reasonable jury could find that making an argument that is supported by the evidence within the confines of an adversarial proceeding is bad faith. Notably, Plaintiff repeatedly claims that there was no evidence to support Defendant's argument because Defendant did not present any independent medical testimony or opinion. Therefore, Plaintiff concludes, that Defendant's arguments were not supported by any evidence and, thus, in bad faith. However, as already discussed, Defendant was arguing inferences based on Plaintiff's own evidence. As indicated above, the Court finds that no reasonable juror could find that arguing inferences from the evidence in an adversarial proceeding is bad faith.[6]

■ Finally, with respect to number 24, first, Plaintiff has not proven through admissible evidence that the DOLF system requires the result alleged (*i.e.* that only under DOLF will Defendant not continue to negotiate once a final offer is made). However, even assuming for purposes of this Order that the allegation is true, the fact that Defendant makes a final offer based on the information in Defendant's possession and will not renegotiate that offer unless new information that would change the value of the claim comes to light, is not objectively unreasonable. Certainly if the offer is unreasonable in the first instance, a claim for bad faith may lie. However, the Court finds that no

---

6. This conclusion is further supported by two other facts in this case. First, the parties were in arbitration pursuant to the terms of the contact. Thus, when Plaintiff purchased his insurance with the arbitration provision, Plaintiff was on notice of the conflict resolution procedure in place under his policy. Therefore, it was not bad faith for Defendant to utilize such conflict resolution procedure when there was a good faith dispute about the value of Plaintiff's claim. Second, and even more importantly, the parties went to arbitration at the insistence of Plaintiff's counsel when Defendant would not accept Plaintiff's final demand. Therefore, the fact that the parties were in the adversarial proceeding and taking conflicting positions was at Plaintiff's demand.

reasonable juror could conclude that refusing to renegotiate an otherwise reasonable offer unless new information justifying renegotiation is discovered, is bad faith.

Moreover, in this case, Plaintiff has not shown that such procedure allegedly affected the processing of Plaintiff's claim. Specifically, Plaintiff made his last offer and advised Defendant if it would not accept this offer, Plaintiff would exercise his right to go to arbitration. Because Defendant would not accept this offer, Defendant went to arbitration based on Plaintiff's demand. Therefore, it is unclear whether Defendant would have been willing to continue further negotiations, because Plaintiff removed renegotiation as an option. Thus, this lack of a nexus to Plaintiff's claim with respect to this allegation further supports the Court's ruling that no reasonable juror could find that this allegation supports a verdict in Plaintiff's favor on bad faith.

■ Thus, after having analyzed each of Plaintiff's allegations of bad faith that relate to the processing of Plaintiff's claims, the only allegation that may support a claim of bad faith is number 2; specifically, that the two offers made by Defendant were less than the arbitrators ultimately awarded (less by $2,680 based on the final offer). Thus, the question on summary judgment is whether based on this undisputed fact a reasonable juror could find that Defendant acted in an objectively unreasonable manner. Based on this evidence, the Court finds that no reasonable juror could find that making an offer that was $2,680 less than the arbitrators ulti-

mately awarded was objectively unreasonable, when the offer included sufficient funds to cover all submitted special damages and general damages equal to the amount of special damages. While there may be a circumstance where an offer of general damages in an amount equal to special damages is evidence of bad faith, in this case, Plaintiff has offered no evidence (other than the fact the arbitrator arrived at a high figurer) to support his argument that Defendant was objectively unreasonable in offering this amount.[7] In addition to Defendant's conduct being objectively reasonable, there is no evidence that there was information available to the Defendant at the time it made its offer that would allow a jury to conclude that the amount of the offer was unreasonable and that Defendant knew the offer was unreasonable. Thus, there is also no evidence that Defendant was subjectively unreasonable in offering this amount. Therefore, Defendant in entitled to summary judgment on Plaintiff's bad faith claim based on these allegations.

### 3. GENERAL PRACTICES OF DEFENDANT

The third category of allegations involve alleged claims practices of Defendant that Plaintiff has not shown affected the processing of Plaintiff's claim. Specifically these are:

12) use of the DOLF program forces the insured to needless litigation because the insured hired an attorney;

---

**7.** This conclusion is further supported by the fact that the difference in the amount offered and the amount awarded is a difference in the appropriate amount of general damages (as it is undisputed that the amount Defendant offered was sufficient to cover all special damages and included an amount for general damages). The Arizona courts have recognized that arriving at the value of general

damages (pain and suffering damages) is subject to differing opinions. The Arizona Court of Appeals stated, "In short, evaluating personal injury claims, and particularly the 'general damage' component, is far from an exact science. Oftentimes it is no more precise or predictable than throwing darts at a board." *Voland v. Farmers Insurance Co. of Az.,* 189 Ariz. 448, 943 P.2d 808, 813 (1997).

18) implementation of the Claims Core Process Redesign (CCPR) in 1995 after an internal audit by Defendant in which Defendant concluded that it was routinely overpaying claims by 15%;

19) use of COLOSSUS, a computer claim valuation system (to make the valuation of similar claims more uniform);

20) use of COLOSSUS as a mandatory valuation tool (rather than a suggestion to the adjustor);

21) COLOSSUS's valuation methodology was not disclosed, Defendant admitted that COLOSSUS was not a viable indicator of the value of claims; Defendant discontinued the use of COLOSSUS in 1998;

22) COLOSSUS did not take into account the affect of an injury to a particular insured life, such as in this case where a physical injury has a high impact because Plaintiff has a job with strenuous physical requirements;

23) soliciting claims early to limit attorney involvement;

25) adjusters were taught to keep payments under the amount suggested by COLOSSUS or the adjuster would have a negative performance review;

26) the DOLF system targets insured that have counsel.

Beginning with all of the evidence regarding the COLOSSUS system, it is undisputed that Defendant at some points used COLOSSUS to value claims and actually used COLOSSUS to set a value range in Plaintiff's case. However, Plaintiff has made no effort to explain how the use of a uniform system for evaluating claims is bad faith. Next, Plaintiff argues that the COLOSSUS value was mandatory on the adjustors. However, it is undisputed that the individual adjusters *in this case* were

not bound by the COLOSSUS valuation (per Plaintiff's statement of facts, the adjusters initially arrived at a value less than COLOSSUS (¶ 44), made a first offer within the range (¶ 47), and made a final offer above the range (¶ 48)). Next, Plaintiff argues that COLOSSUS was discontinued as unreliable in 1998. However, *in this case*, it is undisputed that Defendant was still using COLOSSUS in 1999. Next, Plaintiff argues that the formula used by COLOSSUS did not take into account how an injury might specifically affect a particular individual. Assuming this is true, Plaintiff fails to should how the COLOSSUS program, by not taking into account this one item would, as a whole, be bad faith. Nonetheless, *in this case*, Plaintiff was made an offer that was above the COLOSSUS range; therefore, the adjusters could overcome any "bad faith" in the COLOSSUS system via a manual adjustment of the amount offered. Plaintiff's final allegation with respect to the COLOSSUS system is that adjusters were taught to keep claims below the COLOSSUS number, or they would receive negative performance reviews. Again, Plaintiff has not shown that *his* adjuster, Shannon Bollinger, received such training. Moreover, *in this case*, the first offer made to Plaintiff was in the COLOSSUS range (not below) and the final offer was above the COLOSSUS range. Therefore, even if such training did exist at Defendant, and even if Plaintiff's adjuster received such training, the undisputed evidence shows that this training did not affect the adjusting of *Plaintiff's* claim.

With respect to Plaintiff's other general allegations of bad faith, in number 18 Plaintiff claims that Defendant performed and internal audit, determined it was overpaying claims, and implemented the CCPR. Defendant does not dispute any of these allegations. However, Plaintiff has failed to show how these undisputed facts

are bad faith or evidence of bad faith in the processing of *Plaintiff's* claim. Accordingly, the Court does not find that this allegation supports a claim for bad faith.

■ Plaintiff's final three general allegations of bad faith all involve Defendant's processing of claims when the insured is represented by counsel and specifically the DOLF system. First, at number 23, Plaintiff claims that Defendant targets claims early to avoid the insured getting counsel. Assuming this is true, and assuming this would be bad faith (which the Court has not concluded), the undisputed evidence *in this case* is that by the time Plaintiff contacted Defendant about this claim, Plaintiff already had counsel. Therefore, there was no opportunity to implement this alleged practice against Plaintiff. Additionally, Plaintiff alleges that DOLF targets insureds who have attorneys and causes needless additional litigation. Again assuming these facts are true, Plaintiff has failed to show how treating represented insured and non-represented insured differently is necessarily bad faith. Further, Plaintiff has failed to show how or why the DOLF system causes any extra or needless litigation (assuming it targets represented insured, and assuming Plaintiff was so "targeted"). Moreover, the undisputed evidence *in this case* is that *Plaintiff* exercised the arbitration clause in the contract and demanded that the parties go to arbitration. Therefore, even if all of Plaintiff's general allegations about Defendant's practices are true, *in this case* those practices did not cause any needless litigation because the only litigation has been at Plaintiff's initiation.

Therefore, because all of the above general allegations of bad faith, assuming they are true, did not affect the processing of Plaintiff's claim *in this case* the Court finds that a cause of action for bad faith cannot lie based on these allegations. In other words, if Plaintiff was not personally damaged by the allegedly inappropriate practices, Plaintiff cannot base his claim on such practices.[8]

Therefore, having considered all of Plaintiff's facts which allegedly show bad faith on the part of Defendant, the Court finds that the facts of this case show that Defendant acted objectively reasonable and that no reasonable juror could find otherwise. Accordingly, the Motion for Summary Judgment will be granted on this basis.

### 4. OTHER ALLEGATIONS OF SUBJECTIVELY UNREASONABLE AND INTENTIONAL MISCONDUCT

■ Alternatively, Defendant has moved for summary judgment on the alternative basis that Plaintiff has offered no evidence that Defendant acted in a subjectively unreasonable manner (the second prong of the bad faith test under *Nobel*). In *Knoell*, this Court acknowledged that generally the defendant's belief that it acted subjectively reasonably is a question of fact for the jury. *Knoell v. Metropolitan Life Ins. Co.*, 163 F.Supp.2d 1072, 1077 (D.Ariz.2001). However, this Court also found that to send such question to the jury, the plaintiff, who is the party with the burden of proof, must have *some* evidence for the jury to consider that would indicate that the insurance company acted in a subjectively unreasonable manner. *Id.*

■ The Arizona courts have held that to show behavior is subjectively unreasonable, the plaintiff must show that the de-

---

**8.** *See generally Young,* 2003 WL 21638281 at *9 (finding no facts to support a claim for "institutional bad faith.")

fendant either knew its conduct was unreasonable or acted with such reckless disregard that knowledge that the conduct was unreasonable can be imputed to the defendant. *See Deese v. State Farm Mutual Auto. Ins. Co.,* 172 Ariz. 504, 838 P.2d 1265, 1268 (1992). In other words, the plaintiff can establish this state of mind element by showing that the defendant either knew its position was groundless, or failed to conduct an adequate investigation to make such determination. *Daly v. Royal Ins. Co. of Am.,* 2002 WL 1768887, *10 (D.Ariz.2002). Thus, in this case, Plaintiff must have some evidence of consciously unreasonable conduct to create a question of fact for the jury.

Plaintiff has argued:

a) Plaintiff was humiliated by the arguments presented at arbitration;

b) Plaintiff was forced to undergo polygraphs and was painted as a cheat and a liar;

c) Defendant forced Plaintiff to undergo litigation rather than pay a few more hundred dollars;

d) Defendant abused the arbitration process thereby causing delay in the payment of Plaintiff's claim.

 With respect to a and b above, both of these speak to Plaintiff's state of mind, not Defendant's state of mind. Therefore, neither of these allegations can prove subjectively unreasonable conduct on the part of the Defendant. Allegations c and d both deal with whether Defendant took a consciously unreasonable position in going to arbitration. The undisputed facts of this case are that Plaintiff demanded that Defendant *either* pay $7,000 or go to arbitration. Defendant elected to go to arbitration, the selected dispute resolution process under the contract. Based on these undisputed facts, Plaintiff argues that it was consciously unreasonable for Defendant to pick option 2 of Plaintiff's demand, and instead should have pick op-

tion 1 by paying Plaintiff the amount of money he was seeking (thereby avoiding the delay caused by arbitration). When Plaintiff poses to Defendant two options that are acceptable to Plaintiff, *i.e.* pay a certain amount, *or* go to arbitration, the Court finds that no reasonable jury could find that it was consciously unreasonable conduct on the part of the Defendant to agree to one of Plaintiff's options (particularly, as in this case, where Plaintiff is represented by counsel, and counsel is the one posing the options).

Thus, based on the second prong of *Nobel,* the Court finds that Plaintiff has no evidence in this case on which the jury could base a finding of subjectively unreasonable conduct on the part of the Defendant. Therefore, for this alternative reason, Defendant's motion for summary judgment will be granted.

## IV. PLAINTIFF'S MOTION TO STRIKE ALLEGATIONS OF FRAUD

Defendant's other alternative theory as to why summary judgment should be granted in its favor is that Plaintiff committed fraud in the investigation of his claim; therefore, he cannot recover. Plaintiff counters that: 1) Defendant failed to preserve the affirmative defense of fraud in its answer; 2) Defendant failed to plead the affirmative defense of fraud with particularity, and 3) Defendant is barred by *res judicata* from litigating the fraud issue. Defendant responds that it did plead fraud, that if it failed to plead fraud with particularity, it should be given leave to amend, and that its argument is also and alternatively based on equitable estoppel, which does not have to be plead with particularity. Additionally, Defendant argues that *res judicata* does not prevent this argument because Defendant is not collaterally attacking the arbitration

award. Plaintiff counters that Defendant is seeking to collaterally attack the arbitration award, which is impermissible, and that Defendant cannot prevail on fraud or equitable estoppel because Defendant cannot show that it detrimentally relied on Plaintiff's representations. Additionally, Plaintiff argues that Defendant is barred by judicial estoppel from claiming that it does not have to plead fraud with particularity and that Defendant should not be allowed to amend the answer at this stage of the litigation because such amendment would violate this Court's scheduling order and would prejudice Plaintiff.

Thus far, the Court has not found Plaintiff barred from bringing a bad faith claim based on Defendant's allegations of fraud or equitable estoppel. However, Plaintiff's motion seeks to strike all evidence of Plaintiff's misrepresentation. In this Order, the Court has relied on this evidence to the extent it shows why, after discovery of this evidence, Defendant changed the amount it argued at the arbitration to an amount less than it initially offered. To the extent the Court has relied on such evidence, it will not be stricken because it only shows Defendant's state of mind at the arbitration hearing and is not subject to any evidentiary objection.

With respect to relying on such evidence to determine whether Plaintiff is barred by fraud or equitable estoppel from bringing a claim of bad faith, because the Court has already determined that Defendant's Motion should be granted under both the objective and subjective prongs of *Nobel*, the Court need not reach Defendant's argument that Plaintiff is barred by either fraud or equitable estoppel from bringing a bad faith claim. Accordingly, Defendant's Motion on this additional alternative basis is denied as moot. Further, to the extent Plaintiff's Motion to Strike is to strike all evidence of misrepresentation that would support Defendant's alternative

theory for summary judgment, the motion will be denied as moot because the Court did not reach the merits of Defendant's alternative theory.

## V. CONCLUSION

An uninsured motorist ("UM") carrier contracts with its insured to pay the sum of money the insured *would be awarded* by a finder of fact if the tortfeasor carried liability insurance and a tort claim was pursued to its conclusion against the tortfeasor. Where the claim is for personal injuries and includes general damages, the amount which *would be awarded* is necessarily an unknowable figure. Indeed the same case could be tried before ten different juries or judges and produce ten different verdicts across a wide spectrum of amounts. Therefore, settlement of uninsured and underinsured motorist ("UIM") claims which involve general damages occurs through a negotiation process where each party seeks to "guess" what a fact finder would award the claimant if no settlement were to occur.

Reduced to its essence, Plaintiff seeks to hold Defendant liable in bad faith for failing to properly guess the outcome of the arbitration after having chosen to reject Plaintiff's "take it or leave it" demand. Such a result would pervert the doctrine of bad faith and result in gunpoint negotiations: "either accept my demand or face a bad faith trial if the arbitration award is more than my demand." This not only perverts the doctrine of bad faith but the purpose of arbitration as a means of resolving disputes in UM and UIM cases.

Obviously, as in *Zilisch*, there may be cases where the negotiations are crippled by an inadequate investigation or a failure to consider the results of the investigation; thus, a bad faith claim may lie. Here, however, Plaintiff has attempted to use *Zilisch* as a roadmap for *constructing* a bad faith claim.

Based on the foregoing, the Court will grant Defendant's Motion for Summary Judgment on bad faith. Because punitive damages require "something more" than bad faith,[9] and because the bad faith claim will be dismissed, the punitive damages request will also be dismissed.

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 77) is granted and the Clerk of the Court shall enter judgment for the Defendant, Plaintiff shall take nothing; [10]

**IT IS FURTHER ORDERED** that Plaintiff's Motion in Limine (Doc. # 84–1) is denied as moot; Plaintiff's Motion to Strike Defendant's allegations and evidence of fraud (Doc. # 84–2) is denied in part and denied in part as moot, as indicated above.

**9.** To recover for punitive damages, Plaintiff must show something more than the conduct required to state a claim for bad faith. *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 578 (1986). The something more that must be shown is evidence that Defendant was aware of and consciously disregarded a substantial and unjustified risk that significant harm would occur. *Id.* ("indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damages rule").

**10.** As indicated above, Defendant moved for summary judgment on three separate theories. The Court has found that at least two of the theories justifies summary judgment; the Court did not reach the merits of the third theory.