RENDERED: MAY 13, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0573-MR

BOBBY G. FISH, JR.                                                    APPELLANT


APPEAL FROM BOONE CIRCUIT COURT
v.            HONORABLE RICHARD A. BRUEGGEMANN, JUDGE
ACTION NO. 06-CI-02149


STATE FARM AUTOMOBILE
INSURANCE COMPANY                                                    APPELLEE


OPINION
AFFIRMING IN PART AND REVERSING AND REMANDING IN PART

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; COMBS AND JONES, JUDGES.

CLAYTON, CHIEF JUDGE: Bobby G. Fish, Jr. ("Fish") appeals the Boone

Circuit Court's grant of summary judgment to State Farm Automobile Insurance

Company ("State Farm") on Fish's claim brought under the Kentucky Unfair

Claims Settlement Practices Act. On appeal, Fish argues that there are genuine

issues of fact as to whether State Farm handled his claim in bad faith. Fish further

contends that the trial court committed reversible error when it denied him leave to amend his complaint to include allegations of fraud and fraud upon the court.

For the reasons set forth below, we reverse the trial court's judgment insofar as it granted summary judgment in favor of State Farm and remand for further proceedings. On the other hand, we affirm the trial court's judgment insofar as it denied Fish leave to amend his complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

The instant bad faith action between Fish and State Farm arises from a motor vehicle accident on October 31, 2004. On the day of the accident, Rachel M. Harmon ("Harmon"), a minor, was operating her 2004 Pontiac Sunfire on Salem Creek Road in Walton, Boone County, Kentucky. Salem Creek Road was a two-lane road that permitted vehicular travel in both directions. However, the road was narrow and had no painted center lines or other markings. Fish was operating his vehicle in the opposite direction as Harmon. According to the police report, Fish and Harmon collided at a curve in the road.

Specifically, the police report stated that Harmon told the investigating officer that when she observed Fish's vehicle, "she attempted to hit her brakes, but could not negotiate the curve and went into the opposing lane of traffic, striking [Fish's vehicle]." The police report further stated that Fish told the investigating officer that Fish had observed Harmon's vehicle going left of center.

-2-

To avoid Harmon's vehicle, Fish attempted to go off the road to his right but was struck by Harmon's vehicle.

Both vehicles sustained damage, with Fish's vehicle ultimately rendered a total loss valued at over $13,000.00. The vehicle operated by Harmon was owned and insured by her mother, Debra Harmon, under a personal auto policy underwritten by State Farm. The applicable bodily injury limit on the policy was $100,000.00. As Debra Harmon's daughter and a resident relative and permissive user of the vehicle, Harmon was an "insured" as described in the policy.

Fish refused medical treatment on the day of the collision but began experiencing back pain later that day while participating in a martial arts event. The next day, Fish went to his family physician, Dr. Gary Shearer, who diagnosed Fish with "cervical, dorsal and lumbar strain sacroiliitis." Although Fish continued to work regularly as a plumber, he continued to have back pain. Approximately one month later, Dr. Shearer ordered an MRI, which indicated that Fish had degenerative disc disease ("DDD"). Specifically, the radiologist stated: "There is no definite neural compression noted."

Based on these findings, Dr. Shearer instructed Fish to undergo physical therapy. Fish attended approximately nine physical therapy sessions, and his physical therapist discharged him on January 26, 2005. At the time of

discharge, his physical therapist's notes indicated that Fish had no complaint of pain and that Fish had met all of the goals set in the physical therapy sessions.

### a. Negotiations and Conduct Before the Commencement of Litigation

Meanwhile, throughout the end of 2004 and into the beginning of 2005, State Farm initiated an investigation into the collision. For example, a State Farm claims log note from November 30, 2004, indicated that a State Farm representative spoke with Harmon and documented the following:

> [Harmon] advised that was coming around a turn and she was in the middle of the [road]. There [was] no center line. She saw a truck so she hit the brakes and tried to turn right but it was too late to fix anything. [Fish] turned to try to avoid [Harmon] but [Harmon] still struck [Fish]. [Reviewed police report] which has [Harmon's vehicle] going too fast and also [Harmon] told officer she went more into oncoming lane as she hit the brakes trying to avoid. [Harmon] stated [Fish] was in the middle of the [road] too but I [explained] with her going too fast and not under proper control/skidding into [Fish's] lane and no witnesses, we can't prove any liability on [Fish] but [liability] can be proven on her. She understood we will accept [liability] on her.

At the beginning of 2005, State Farm also paid Fish's property damage claim.

By March 10, 2005, State Farm's claims log notes from that period consistently indicated that it considered Harmon to be at fault in causing the collision. At that point, Fish's insurance company, Liberty Mutual, had paid approximately $2,360.00 in medical expenses for Fish. Other notes from the State

Farm claims log indicate that Fish had undergone an MRI that had indicated a "degenerative condition" wherein the "accident aggravated an underlying condition"; that Fish had a physical job as a plumber and that his job could be a "contributing factor to his back pain"; that the "[m]echanism of injury" was consistent with Fish's lower back pain complaints; and that the impact on Fish's car had been "severe" and the impact on Harmon's car had been "moderate."

Based on the foregoing, the State Farm representative determined at that time that State Farm should value the current value of the claim at between $1,500.00 and $3,000.00. However, the representative noted that State Farm would need more records and bills to consider the future value of Fish's claim. The representative indicated in the claims log notes that an argument in favor of a lower evaluation was that the injury was soft tissue, but that an argument in favor of a higher value was that State Farm considered Harmon to be "100% at fault" for causing the collision.

Thus, on March 10, 2005, State Farm contacted Fish and attempted to settle his claim for $1,500.00. Fish stated that he wanted to discuss the settlement offer with his brother, an attorney, and call State Farm back. State Farm spoke with Fish again on April 8, 2005, at which time Fish rejected State Farm's settlement offer of $1,500.00. State Farm increased its offer to $2,000.00, which Fish also rejected. Fish explained that he was still receiving medical treatment for

-5-

his injury, but would accept $10,000.00 to settle the claim. The State Farm representative stated that State Farm "was not anywhere near" that number. Both parties agreed to speak again after more medical records and other information were forthcoming.

State Farm subsequently received copies of Fish's medical bills throughout May 2005. In addition, a claims log note from May 3, 2005, indicated that State Farm received the medical bills from Fish's physical therapist, which contained the following diagnosis information:

> L-strain and L-disc disease. [Fish] makes note on some paperwork for the [doctor] that he has a protruding disc, but [doctor] states that there is not. [Kentucky] Diagnostic[] Center states that there is a "small focal protrusion" at L3-4. At L5-S1, there is a small protrusion to mod[erate] sized protrusion, but it does not indent or touch the thecal sac.

Thereafter, on June 13, 2005, a State Farm representative spoke to a nurse who had reviewed the results of Fish's MRI. The claims log notes reveal that the nurse indicated that "MRI report states that there is not pressure causing problems. Protrusions on the discs are degenerative in nature. One compresses the nerve root a little, but is not putting pressure on the spinal cord." The nurse recommended looking at Dr. Shearer's interpretation of the MRI. The log indicated that Dr. Shearer specified in his report that "[Fish] stated there is a

protrusion, but it is unseen." Additionally, the log entry from that same day seems to downgrade the level of impact, stating that it was "moderate to severe."

State Farm spoke with Fish again on June 14, 2005, at which time they increased their offer to $2,500.00. The State Farm representative indicated in the claims log note from that day that the representative had reviewed the notes and medical records with Fish that State Farm had obtained thus far. Fish stated that his doctor was treating him, but he would call back after seeing his doctor again.

On July 8, 2005, the claim log indicates that a State Farm representative spoke with Fish. Fish declined State Farm's offer of $2,500.00, with Fish stating that his doctor had indicated that he may have problems for the rest of his life and reiterating that he would not accept anything less than $10,000.00. State Farm told Fish that, without further documentation, it could not increase its offer but that it would be happy to review any new information. Fish stated that he understood.

On August 12, 2005, State Farm received notice of a subrogation claim from Liberty Mutual for its medical expense payments up to that date of $2,425.15. Additionally, a September 10, 2005, claim log note stated that a State Farm representative should contact Fish about its offer in forty-five days. Further,

it noted that State Farm might receive more medical records or bills from Fish in the meantime.

On October 13, 2005, State Farm documented receiving a letter of representation from an attorney for Fish, which State Farm also forwarded to Harmon. The claims log further indicates that State Farm attempted to contact Fish's lawyer on October 24, 2005, December 27, 2005, February 27, 2006, April 27, 2006, and June 26, 2006, August 16, 2006, August 31, 2006, and September 26, 2009, all with no response. Additionally, a claims log note from July 12, 2006, indicates that State Farm sent a letter to Fish's counsel reiterating its $2,500.00 offer and received no response.

On September 29, 2006, State Farm documented receiving a time-limit demand package from Fish dated September 22, 2006, demanding the payment of its policy limits of $100,000.00 and expiring on October 25, 2006.

On October 16, 2006, State Farm began its evaluation of the materials in the demand package. It stated the defense's strengths as being that the injury was soft tissue and evidence of degenerative disc disease. In addition, it noted the "factors that affect value" as being Harmon's "clear" liability in causing the collision, "moderate impact," and the fact that Fish's medical records do not reflect that he had any back problems before the accident. State Farm also noted that Fish had sought treatment the day after the accident, that he had an MRI, that he had

undergone a course of physical therapy, and that he had been discharged from physical therapy as Fish had met all of his goals. It further noted a medical lien of almost $3,000.00. Thus, the State Farm representative valued the claim between $4,000.00 and $6,000.00 and submitted it for approval.

On October 17, 2006, State Farm's management granted up to $6,000.00 for general damages and another $1,891.00 for the personal injury protection ("PIP") subrogation claim. A State Farm representative spoke to Fish's counsel and extended an offer of $4,000.00. Fish's counsel rejected the offer, explaining that the amount offered was nowhere near the claim's value. Fish's counsel further indicated that Fish would be filing a lawsuit. State Farm's log again noted that "[b]ased on MRI findings one protrusion abuts right L4 nerve root and may compress it but no central compression." State Farm also sent a letter to Fish making the $4,000.00 offer on that same day and advised Debra Harmon of the possibility of a lawsuit. A State Farm representative also spoke to Fish's attorney on October 19, 2006, reinforcing that the evaluation "was based on medical reports, medical bills and diagnostic reports that were provided."

### b. Post-Litigation Commencement Negotiations and Conduct

On October 24, 2006, Fish filed a lawsuit against State Farm, alleging bad faith and unfair claims settlement practice violations under Kentucky Revised Statutes ("KRS") 304.12-230 and KRS 304.12-235.

On November 1, 2006, the State Farm claims log noted receipt of the lawsuit paperwork and that the claim was moving to the litigation department. The log notes state that Fish had "degenerative issues," that "under $3K [had been] paid by PIP carrier." However, seemingly for the first time and without explanation, the log notes state that the "impact to [Fish's vehicle was] not significant." On November 15, 2006, State Farm moved to bifurcate Fish's common law and statutory bad faith claims from the underlying liability claims until resolution of the liability claims.

Thereafter, in a November 21, 2006, assignment letter to defense counsel, State Farm advised counsel, "[i]t appears Rachel Harmon was responsible for this accident occurring." Nevertheless, in a November 28, 2006, case analysis by State Farm's defense attorney, his "Liability Analysis" stated that: "It appears Ms. Harmon's actions were the cause of the automobile accident. However, Salem Creek Road is a very narrow road and I want to take all parties' depositions before I concede liability." Both parties engaged in discovery throughout the beginning of 2007, with State Farm's defense attorney promulgating and receiving discovery from Fish and engaging in the process of scheduling some depositions.

Fish ultimately underwent surgery on his lumbar spine on May 31, 2007. Thereafter, on October 25, 2007, Fish's counsel sent a second demand package to State Farm containing updated medical records and bills from Fish's

surgery. Specifically, the package indicated that Fish had undergone a "[l]eft L5-S1 facetectomy, left L5-S1 transforaminal diskectomy, left transforaminal arthrodesis, L5-S1. Pedicle screw fixation L5-S1 with Stryker screws and rod."

The second demand package also contained a note from Dr. Paul Lewis dated June 29, 2007. Dr. Lewis was the neurosurgeon who had performed Fish's surgery. In the note, Dr. Lewis stated that, as a result of the accident, Fish suffered a back injury and that, although he would recover from surgery, he "would never be the same again." The second demand package also included Dr. Lewis's post-operative report, which stated Dr. Lewis's pre-operative diagnosis of Fish as a "[h]erniated and degenerated disk L5-S1."

The second demand package also contained new medical bills of over $51,000.00. Fish's counsel noted that the PIP carrier, Liberty Mutual, had refused to pay certain bills associated with the surgery, arguing that such bills were unrelated to the accident. Fish included such communications in the package, including a May 18, 2007, peer review report from Dr. Robert Sexton obtained by Liberty Mutual, in which Dr. Sexton opined that the surgery was unrelated to the accident. The demand package also included a report from Fish's medical expert opining that Fish had sustained a twenty percent (20%) permanent impairment to the whole person and would be unable to return to the normal activities of a master plumber. The demand package letter from Fish's counsel further stated that Fish

-11-

had been off work since May 24, 2007, and had been receiving short-term disability. Finally, Fish's counsel stated that he would be submitting all medical documentation and disability ratings to a vocational expert for an opinion regarding lost wages and impairments to earning. Thus, Fish requested the policy limits of the State Farm policy.

Although there appear to be no specific notes in State Farm's log concerning receipt of the second demand package on October 27, 2007, a November 8, 2007, claims log note stated that a State Farm representative had spoken with defense counsel and that defense counsel had just received Fish's interrogatories. The note further stated that they were waiting on medical bills and reports. Thereafter, defense counsel indicated that he would schedule Fish's deposition.

There appeared to be a lull in activity between this claims log note and the beginning of 2008. Fish filed a set of answers to interrogatories and requests for production of documents on March 21, 2008, and State Farm noted receipt of those on March 31, 2008. In addition, on April 2, 2008, for the first time, State Farm documented in the claims log that Fish had undergone surgery in May 2007. However, it did not re-evaluate his claim based on this new information and did not change its reserves but noted that the defense attorney was still compiling medical records and expenses and had scheduled depositions.

State Farm deposed Fish on June 2, 2008. In defense counsel's deposition summary letter to State Farm, he explained that Fish missed approximately five months of work after his spinal surgery. He further reported that causation was in question as there was a "peer review letter regarding the surgery, which indicate[d] that in fact the surgery [was] related to the pre-existing degenerative conditions as opposed to this accident." Regarding liability, he reported, "[i]t does appear that . . . our insured crossed left of center causing the impact. Liability seems fairly clear."

On June 13, 2008, a State Farm representative reviewed Fish's deposition testimony and evaluated the claim's range of value as still being between $4,000.00 and $6,000.00 for general damages. On October 21, 2008, a State Farm representative documented a discussion with defense counsel, who indicated that State Farm needed to obtain an independent medical examination of Fish's injuries.

On January 7, 2009, a State Farm representative again spoke with defense counsel, who informed her that he had obtained a records review report from Dr. Robert Sexton, the same doctor previously hired by Liberty Mutual. Dr. Sexton reviewed Fish's medical records and concluded that Fish's surgery was "related to his pre-existing condition as opposed to injuries sustained" in the

collision. The claims representative also requested that defense counsel set up mediation.

On January 16, 2009, a State Farm representative read the records review report but did not comment on the report in her claim file notes. On February 12, 2009, a different State Farm representative noted in the claim file they need to have all records "to prepare an update evaluation and assess what percentage of the surgery may be related to this loss." Additionally, on February 18, 2009, a State Farm representative changed the reserve for the first time from $8,800.00 to $15,000.00.

Thereafter, State Farm spoke with defense counsel on March 30, 2009, who indicated that he had made numerous attempts to contact Fish's counsel and set a mediation date, but Fish's counsel had been unresponsive. Additionally, defense counsel stated that the court had set a trial date for September 29, 2009. Defense counsel further indicated that he did not feel that State Farm's offer amount of $4,000.00 needed to be changed, based on Dr. Sexton's report relating Fish's need for surgery to his pre-existing condition.

The State Farm representative requested that defense counsel review and give his opinion regarding the settlement offer and continue attempts to obtain a mediation date from Fish's counsel. Later that day, a claims team manager reviewed the claim file and agreed that it would be a good idea to review the claim

with defense counsel "to see if [an] updated evaluation is needed." At that point, the current documented evaluation range of between $4,000.00 and $6,000.00 had not substantially changed since its last evaluation in 2006, before Fish's surgery.

A State Farm representative reviewed the case with defense counsel again on April 23, 2009, when defense counsel stated that Fish's counsel was still unresponsive and did not appear interested in setting a date for mediation.

Thereafter, a July 23, 2009, claims log note stated that a State Farm representative had reviewed defense counsel's pre-trial report. Specifically, the report noted that defense counsel felt that there was a possibility that a jury could find that Fish was fifty percent (50%) liable for the collision due to the condition of the road being unmarked and narrow. As to liability for Fish's injury, defense counsel's report noted that Fish did not report any injuries at the accident scene and subsequently attended a martial arts seminar where he participated in hand-to-hand combat exercises. The report further noted that the MRI showed only degenerative changes in Fish's lumbar spine and Fish had concluded physical therapy in January of 2005. At that time, he only had a little pain and stiffness.

State Farm took Fish's deposition again on July 28, 2009. The State Farm representative who attended the deposition noted in the claims log that, "I discussed with defense counsel that we will need to get a good evaluation on this [claim] prior to going to mediation as there are some things which could

potentially go well in our favor, but there are some things which could go well for plaintiff . . . our evaluation of $4-$8k need to be updated." She further documented the outstanding tasks as "Pends for updated evaluation, set up mediation." That same day, another manager reviewed the claim and noted in the claims log that it was "very questionable as to whether the surgery would be causally related to this" collision due to Fish's activities following the accident.

On August 7, 2009, the claims log noted that Fish's surgeon, Dr. Lewis, had passed away. The trial date was changed to April 26, 2010, and, on September 28, 2009, a State Farm representative again documented in the claim activity log, "[o]ur prior evaluation of 4-8k needs to be updated."

On November 2, 2009, a State Farm representative spoke with defense counsel and noted in the claims log, "[w]ith liability being an issue and damages we feel our current evaluation is adequate." The State Farm representative primarily based this on the fact that Dr. Sexton's report did not relate the injury to the collision.

On March 30, 2010, defense counsel discussed with a State Farm representative the deposition of Dr. Schwetschenau, a partner of Dr. Lewis. While defense counsel reported to State Farm that the deposition "went very well for us[,]" Dr. Schwetschenau testified that Fish's "low back complaints were triggered

by this accident." Further, he opined that "the surgery was reasonable and necessary, and related to this accident."

Subsequently, a claims section manager instructed a claims handler to "[g]et EAP out when discovery is complete. Continue attempts to negotiate a settlement. Proceed to trial if necessary." As later explained by a State Farm representative in a deposition, excess assurance protection ("EAP") is coverage extended to an insured by State Farm in the case of a judgment over the insured's policy limits. However, it is unclear whether this letter or other offer of coverage was ever extended to Harmon as instructed by the manager.

Fish tried his claims against Harmon before a jury on April 26, 2010. The jury found Harmon to be one hundred percent (100%) liable for the collision. Additionally, the jury awarded Fish $191,191.00 in past and future medical expenses, $18,000.00 for loss of wages and income, and $106,872.30 for pain and suffering. Ultimately, the trial court reduced the verdict to a judgment of $206,000.00.

Fish subsequently requested to amend his complaint on August 25, 2016, based on his allegation that State Farm had failed to disclose that it would cover any amounts of a judgment made against it at trial above the policy limits. However, the court entered an order on November 2, 2016, denying Fish's request to amend the complaint.

Fish also pursued the bad faith claims alleged in his complaint. As a result, State Farm moved for summary judgment on October 19, 2020. The trial court ultimately found that the record demonstrated no genuine dispute as to liability for the accident and whether the collision caused the injuries that necessitated Fish's surgery. As a result, the trial court granted summary judgment in State Farm's favor and dismissed Fish's bad claims on May 12, 2021.

Further facts will be discussed as they become relevant.

## ISSUES

## ANALYSIS

### a. Standard of Review

A court may grant a summary judgment motion when "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rule of Civil Procedure (CR) 56.03. The Kentucky Supreme Court has stated that, "the movant should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 482 (Ky. 1991) (citation omitted). Further, "[o]nly when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor should the motion for

-18-

summary judgment be granted." *Id*. (citations omitted). Indeed, "[e]ven though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact." *Id*. at 480 (citation omitted). Moreover, when examining a summary judgment motion, "[t]he record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Id*. (citations omitted).

"Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So we operate under a *de novo* standard of review with no need to defer to the trial court's decision." *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (citations and footnotes omitted).

### b. <u>Kentucky's Unfair Claims Settlement Practices Act</u>

Kentucky's Unfair Claims Settlement Practices Act (the "Act") "is intended to protect the public from unfair trade practices and fraud." *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988). The Kentucky Supreme Court has stated that the Act "should be liberally construed so as to effectuate its purpose." *Id*. (citations omitted).

Among other things, the Act "imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured . . . ." *Knotts*

*v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006). Perhaps most relevant to this case, the Act prohibits insurers from failing to "attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]" KRS 304.12-230(6). An insurance company's violation of the Act can create a private cause of action for a third-party claimant. *Reeder*, 763 S.W.2d at 118. Moreover, the duties imposed by the Act on an insurer to a third party apply both before and after the commencement of litigation by the third party against the insured. *Knotts*, 197 S.W.3d at 517.

To state a cause of action against an insurer for bad faith under the Act, a plaintiff must show that: "(1) the insurer [was] obligated to pay the claim under the terms of the policy; (2) the insurer . . . lack[ed] a reasonable basis in law or fact for denying the claim; *and* (3) . . . the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Hollaway v. Direct General Insurance Company of Mississippi, Inc.*, 497 S.W.3d 733, 737-38 (Ky. 2016) (emphasis in original) (citing *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993)). Moreover, as stated by the Kentucky Supreme Court, "[p]roof of this third element requires evidence that the insurer's conduct was outrageous, or because of [the company's] reckless indifference to the rights of others." *Id.* at 738 (citation omitted).

Further, the Kentucky Supreme Court has noted that "all elements of the [standard] must be established to prevail on a third-party claim for bad faith under [the Act]." *Id.* Thus, a plaintiff "must go beyond simply showing [an insurer's] liability . . . [but] must also proffer evidence that the insurer's motive was recklessly indifferent to [the plaintiff's] right to recover." *Id.* Moreover, "[b]ecause [a plaintiff] bears the burden of establishing all three elements, to defeat summary judgment [the plaintiff] must offer proof for all three." *Id.*

"The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000), *as modified on denial of reh'g* (Feb. 22, 2001) (quoting *Zilisch v. State Farm Mutual Auto. Ins. Co.*, 196 Ariz. 234, 238, 995 P.2d 276, 280 (2000)). Indeed, "although elements of a claim may be 'fairly debatable,' an insurer must debate the matter fairly" and "still is obligated under the [Act] to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner." *Id.* at 375. Moreover, "whether a claim or the amount of a claim is fairly debatable is a question of fact for the jury[.]" *Id.* at 376.

### c.  The Trial Court Erred in Granting Summary Judgment on Fish's Bad Faith Claim

In this case, we conclude that summary judgment was improper, as Fish offered sufficient proof for each of the three *Hollaway* elements discussed above. Beginning with liability under the policy, the Court in *Hollaway* discussed the "two distinct questions of law" in assessing an insurer's duty to compensate a claimant based on their insured's liability. 497 S.W.3d at 738. These two issues involved both "liability for the accident itself" and liability based upon "the extent and severity of [the] alleged injuries from the accident[.]" *Id*. at 738-39.

As to the second issue, the Court in *Hollaway* found that the insurer had disputed from the very beginning whether the accident had caused the alleged injuries sustained by the plaintiff. *Id*. The record in *Hollaway* included the plaintiff's "well-documented . . . history of physical complaints not dissimilar to the physical complaints she attributes to the accident." *Id*. at 739. Moreover, the insurer in *Hollaway* consistently characterized the accident and its impact on the claimant as "low impact[.]" *Id*.

In this case, we find that Fish offered sufficient proof that State Farm's insured – Harmon – was liable for both types of liability discussed by the *Hollaway* Court. First, Fish provided evidence that Harmon was liable for causing the accident itself. Not only did the jury find Harmon to be one hundred percent responsible for the accident, but Fish provided the State Farm claim diary, in which

State Farm noted multiple times that it had determined that Harmon was fully liable for causing the accident.

Fish also provided evidence of the second form of liability described in *Hollaway*. Specifically, Fish provided a note from his treating neurosurgeon stating that the accident had been the reason for his surgery. Additionally, Fish provided the depositions of both Dr. Schwetschenau and Dr. Shearer, in which they opined that the accident had caused the injuries for which he ultimately underwent surgery. Moreover, unlike in the *Hollaway* case, Fish provided evidence that State Farm consistently described the damage to his vehicle as "severe," and that he had never sought treatment for any of his injuries before the accident. Thus, we conclude that Fish provided evidence that State Farm was obligated to pay the claim under the terms of the policy sufficient to overcome summary judgment.

We also find that Fish provided evidence sufficient to overcome summary judgment regarding the second and third *Hollaway* elements. 497 S.W.3d at 738. Those elements concern whether State Farm "lack[ed] a reasonable basis in law or fact for denying the claim" and whether State Farm "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Id*. (citation omitted). As previously discussed, the Act requires plaintiffs to prove that an insurer's actions during the

resolution of the claim were "outrageous, or because of [the insurer's] reckless indifference to the rights of others." *Id*. (citation omitted).

In this case, Fish provided evidence that, at some point between October 25, 2007, and March 31, 2008, Fish put State Farm on notice that Fish had undergone lumbar surgery; Fish's treating doctors had related the surgery to the accident; Harmon was liable for causing the accident; the impact to Fish's vehicle was "severe" and had totaled Fish's vehicle; Fish had no prior treatment before the accident and had no previous injury claims; and Fish had incurred over $51,000.00 in medical expenses.

Further, Fish has provided proof that, as of the date of trial, State Farm never changed its evaluation or offer of $4,000.00 versus Fish's policy limit demand of $100,000.00. Although State Farm had raised its reserve days earlier to $20,000.00, it never increased its offer. Fish contends that State Farm failed to properly consider new information since the claim was evaluated years earlier and considered only the evidence supporting their desired outcome. Indeed, the ultimate judgment was approximately fifty times greater than State Farm's highest settlement offer.

Additionally, Fish provided a report and affidavit from an expert witness, Stuart J. Setcavage, concerning State Farm's allegedly unreasonable claims-handling practices. As detailed in his report, Setcavage had more than

-24-

twenty-four years of experience working in the insurance industry and handling, supervising, negotiating, and settling automobile claims. He also participated in various training programs related to his profession.

In his affidavit, Setcavage opined that State Farm lacked a reasonable basis in law or fact for delaying payment of the claim for so long and either knew there was no reasonable basis for delaying payment of the claim or acted with reckless disregard for whether such a basis existed. He further opined that State Farm's conduct was outrageous and showed a reckless indifference to Fish's rights. Setcavage further testified to a series of facts that, when viewed in the light most favorable to Fish, constituted evidence that State Farm both lacked a reasonable basis in law or fact for refusing the prompt, full, and fair payment of Fish's claim and that State Farm either knew or should have known of the foregoing. These facts included that: (1) "State Farm arbitrarily and capriciously attempted to apply comparative negligence without any new information"; (2) "State Farm adopted an obdurate position that was based upon speculation that the plaintiff's injury was not a result of this car wreck but rather a result of an underlying condition" and "[w]hen it adopted this position, the only evidence it had suggested otherwise"; (3) "State Farm made a low-ball offer that it never changed despite significant new developments that directly changed the value of the claim"; and (4) "State Farm's position was based upon speculation and is

-25-

indicia of a biased evaluation of the evidence a jury would have to consider when considering the value of [Fish's] claim against its insured."

Finally, as already discussed, even if the claim was "fairly debatable," the insurer must debate the matter "fairly." *Farmland*, 36 S.W.3d at 375. The examination by Setcavage of the claim file and his opinions as to State Farm's adherence to standards for adjusting a claim in good faith are sufficient to present to the jury whether State Farm debated the matter "fairly," thus requiring denial of summary judgment on this basis as well.

In conclusion, Fish has provided sufficient proof as to each *Hollaway* element, and his expert has opined the same from his review of the facts of the case. Moreover, Fish's expert has couched his opinion in the exact terms used in each element of the test, rather than just generally opining about violations of the Act. As such, genuine issues of material fact existed upon which reasonable minds could disagree.

All of this is not to say that a jury will ultimately find that State Farm violated the Act by processing Fish's claim in bad faith. But the evidence presented by Fish is sufficient to raise a genuine dispute as to this issue. In other words, it does not "appear[] that it would be impossible for [Fish] to produce evidence at the trial warranting a judgment in his favor and against [State Farm]." *Steelvest*, 807 S.W.2d at 483 (citation omitted).

-26-

### d. **The Trial Court Properly Denied Fish's Request to Amend His Complaint**

Ten years after filing his complaint, Fish requested leave from the court to amend his complaint to allege fraud because of State Farm's alleged failure to advise Fish and the trial court that State Farm had extended EAP.

CR 15.01 states that, after the initial answering period, "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Ultimately, whether a party may amend his complaint is discretionary with the circuit court, and we will not disturb its ruling unless it has abused its discretion. *Lambert v. Franklin Real Estate Co.*, 37 S.W.3d 770, 779 (Ky. App. 2000).

In this case, Fish's brief does not address the trial court's reasoning in denying his motion for leave to amend. Nor does he address the legal differences between a policy covering an insured's liability for the insured's actions versus the extension of assurance protection to protect against potential liability for an insurer's conduct. As the standard for review of a trial court's denial of leave to amend is an abuse of discretion, Fish has provided us with no concrete reasons as to why the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). We affirm as to this issue.

## CONCLUSION

Based on the foregoing, we reverse the trial court's grant of summary judgment in favor of State Farm, affirm the trial court's denial of Fish's motion to amend his complaint, and remand this matter for further proceedings.


ALL CONCUR.


BRIEFS FOR APPELLANT:

John H. Metz
Cincinnati, Ohio

Bill Meader
Hyden, Kentucky

ORAL ARGUMENT FOR
APPELLANT:

John H. Metz
Cincinnati, Ohio

Bill Meader
Hyden, Kentucky

BRIEF FOR APPELLEE:

Richard W. Edwards
Louisville, Kentucky


ORAL ARGUMENT FOR
APPELLEE:

Richard W. Edwards
Louisville, Kentucky